UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

Fetch Compute, Inc., Seth Ian, Greg Graves,
Victor Larivee, individually and on behalf of
all others similarly situated,

              Plaintiffs,

       -against-

Bruce Pon, Trent McConaghy, Christina Pon,
Ocean Protocol Foundation Ltd., Ocean
Expeditions Ltd., and OceanDAO,

              Defendants.

------------------------------------------------------- X

CASE NO.: 1:25-cv-9210

## CLASS ACTION COMPLAINT

Plaintiffs Fetch Compute, Inc. ("Fetch Compute"), Seth Ian, Greg Graves, and Victor Larivee, in their capacity as Class Representatives, through their undersigned counsel, K&L Gates LLP, brings this action against Defendants Bruce Pon, Trent McConaghy, Christina Pon, Ocean Protocol Foundation, Ltd. ("Ocean"), and Ocean Expeditions, Ltd. ("Ocean Expeditions") (collectively, "Defendants"), and alleges as follows:

## NATURE OF THE CASE

1.     Defendants operated an entity they claimed was a decentralized autonomous organization ("DAO"), with the purported goal of developing open-source artificial intelligence. Defendants made multiple representations to their community that OceanDAO would remain decentralized and autonomous, meaning that power would be spread across the community rather than held by a central authority, and that OceanDAO would operate independently based on predefined rules and without human intervention. The community stood to reap substantial benefits if the Defendants honored their commitments and advanced the community's goals. But

the Defendants' representations were false. Unfortunately, those falsehoods were not discovered until after Ocean deceptively entered into a token merger and alliance with non-parties Fetch.ai and SingularityNET in mid-2024 – forming the Artificial Superintelligence ("ASI") Alliance (the "Alliance").

2.    The Alliance was comprised of individuals and organizations who prioritized the goal of developing decentralized AI in an ethical and acceptable manner. Unfortunately, rather than supporting this altruistic objective, Defendants utilized the Alliance as a vehicle to defraud not only the members of the Alliance, but the public writ large who supported its mission.

3.    The Alliance was formed by combining the "tokens" issued by the three platforms—Ocean, Fetch (defined below), and SingularityNET. Tokens are digital assets representing ownership and governance rights, enabling members to vote on proposals and influence the issuing organization's future. The combination of each platform's tokens was represented to the public as a "token merger." Through the token merger, Ocean ($OCEAN) and Singularity ("$AGIX") token holders converted their tokens to Fetch ("$FET") tokens, and thereafter were traded as a combined token under the $FET ticker.

4.    At the time of the token merger, there were considerably more $FET and $AGIX tokens in circulation than $OCEAN tokens. As a result, the token merger benefitted the Defendants by allowing them to convert a smaller pool of $OCEAN tokens into a substantially larger pool of $FET tokens. This was critical to provide Defendants with the liquidity needed to later dump their tokens for a windfall, at the direct expense of the Alliance community.

5.    Indeed, just one year after the merger, beginning in June 2025, Defendants manipulated the merger so they could reap millions by abusing their position of trust over the $OCEAN tokens and with the Alliance community at large. Their improper conduct occurred in

five premeditated steps. <u>First</u>, they misled existing $FET and $AGIX token holders so they would vote to allow Ocean to join the Alliance. <u>Second</u>, they converted $OCEAN Community Tokens—tokens required to be given to the Alliance community as rewards for participating in the development of AI—into $FET tokens. <u>Third</u>, they dumped the $FET tokens into the market by selling them en masse, generating a massive financial gain for the Defendants at the expense of other token holders. <u>Fourth</u>, Defendants caused Ocean to abruptly exit the Alliance on October 9, 2025. <u>Finally</u>, Defendants announced that all $OCEAN tokens that had not been converted into $FET tokens could be freely traded, the effect of which has been to drive up the price of $OCEAN tokens and further drive down the value of $FET tokens.

6.    Defendants' conduct was a blatant breach of their obligations, which Defendants referred to as a "covenant" with the token holders. A central tenet of this covenant was the commitment to the combined token holder community that a large number of (formerly) $OCEAN tokens would be reserved as "community tokens" used to incentivize the development of datasets critical to the establishment of open-source AI. In this regard, the community tokens were akin to "seed money" to be used solely to help launch the Alliance and achieve the community's goals via a decentralized and automated reward system.

7.    Defendants promised the public and members of the community that community tokens would only be distributed (granted) to people and projects that pursued the community's goals. This obligation was memorialized in a white paper in which Defendants highlighted the supposed goals for decentralized artificial intelligence that it shared with Fetch and SingularityNET. Defendants knew the dissemination of this mission statement was a core promise to the community that would incentivize community growth and a corresponding increase in the value of membership units (tokens).

8. When Defendants converted and liquidated the $OCEAN Community Tokens for their own financial gain, they breached their publicly affirmed covenant and defrauded the community of token holders who believed in the promise of building a better world through the collective development of distributed AI. While Ocean has taken steps to hide the movement and dissipation of these tokens, Defendants likely have reaped over $100 million of ill-gotten gains, and the class members have been left holding tokens whose value has been significantly depressed by Defendants' wrongful conduct.

9. Upon information and belief, the victims of Defendants' scheme are in the hundreds of thousands, including many individuals who bought and/or held the Alliance's $FET token because of Defendants' representations. The harm caused by Defendants' scheme was not merely economic—the Alliance community's goal of developing decentralized artificial intelligence has been significantly undermined.

10. The Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals who purchased, transferred, or held tokens that were adversely affected by Defendants' wrongful scheme.

## THE PARTIES

11. Fetch Compute is a Delaware corporation that provides free access to high-performance graphics processing units to support AI researchers, developers and open-source innovators. Fetch Compute is a holder of $FET tokens.

12. Plaintiff Seth Ian, who is domiciled in New York, acquired $AGIX tokens prior to the token merger of the $FET, $OCEAN, and $AGIX tokens. Mr. Ian voted in favor of the Alliance and the token merger. Mr. Ian converted his $AGIX tokens into $FET tokens after the token merger.

13.     Plaintiff Greg Graves, who is domiciled in New York, is a holder of approximately 30,000 $FET tokens as of the date this Complaint was filed, and purchased all of his $FET tokens prior to March 2024.  Mr. Graves voted in favor of the Alliance and the token merger.

14.     Plaintiff Victor Larivee, who is domiciled in California, acquired approximately 1,000,000 $AGIX tokens before the token merger.  Mr. Larivee voted in favor of the Alliance and the token merger.   After the token merger, Mr. Larivee converted his $AGIX tokens into approximately 475,467 $FET tokens.

15.     Bruce Pon is a citizen of Singapore who, on information and belief, lives in Bucharest, Romania.  Mr. Pon, along with Defendants Christina Pon and Trent McConaghy, is a co-founder of Ocean.  Mr. Pon currently serves as a director of Ocean and the sole director of Defendant Ocean Expeditions.

16.     Ocean Protocol Foundation Ltd. ("Ocean") is a non-profit organization incorporated under the laws of Singapore.  Ocean operates a secure platform for data exchange and issues a digital token, "$OCEAN."

17.     Upon information and belief, OceanDAO was created in 2020 by Ocean, purportedly as a grants DAO created to fund Ocean community projects that were curated by the Ocean community.  Exhibit 1, Alex N, *Introducing OceanDAO*, Ocean Protocol (Nov. 30, 2020), https://blog.oceanprotocol.com/introducing-oceandao-efe9ed681b84.        Defendants    Pon, McConaghy, and Ocean repeatedly represented OceanDAO was an independent organization, though it is unclear whether OceanDAO was a distinct legal entity or an alter ego that Pon and McConaghy used to carry out their scheme. On October 4, 2022, Trent McConaghy announced on the Ocean blog that Ocean DAO was going "fully decentralized and autonomous."  Exhibit 2, Trent McConaghy, *OceanDAO Is Going Fully Decentralized and Autonomous*, Ocean Protocol

(Oct. 4, 2022), https://blog.oceanprotocol.com/ocea.ndao-is-going-fully-decentralized-and-autonomous-cb4b725e0360.

18.     Upon information and belief, OceanDAO was converted into Ocean Expeditions in or around June 2025, and the assets of OceanDAO were transferred to Ocean Expeditions.  Exhibit 3, Ocean Protocol Team, *Ocean Community Tokens are the Property of Ocean Expeditions* (Oct. 27, 2025), https://blog.oceanprotocol.com/ocean-community-tokens-are-the-property-of-ocean-expeditions-07603899512f.

19.     Ocean Expeditions is a Cayman Island limited liability company, which, according to public statements by Ocean, facilitated a transition of certain "passively held $OCEAN [that] were converted to $FET" from Ocean's community incentives wallet.  Exhibit 4, Bruce Pon, *The ASI Alliance from Ocean's Perspective*, Ocean Protocol (Oct. 23, 2025), https://blog.oceanprotocol.com/the-asi-alliance-from-oceans-perspective-f7848b2ad61f.

20.     Christina Pon is a citizen of Singapore who, on information and belief, lives in Bucharest, Romania.  Ms. Pon is a co-founder of Ocean and a current employee of Ocean.

21.     Trent McConaghy is a citizen of Germany who, on information and belief, lives in Berlin, Germany.  Mr. McConaghy is a co-founder of Ocean and currently serves as a director of Ocean.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) where there are approximately, upon information and belief, 200,000 token holders, approximately 1.8 billion tokens are in circulation, the amount in controversy exceeds $5,000,000, and diversity exists as between at least one class member and Defendant.

23.     Defendants are subject to personal jurisdiction in this district where they have

purposefully availed themselves of the United States market as more fully set forth below, but including: (i) the solicitation and distribution of $OCEAN tokens; (ii) dissemination of the Vision Paper (defined below); (iii) issuance of the Press Release (defined below); and (iv) solicitation of persons in this district to acquire $OCEAN tokens, convert $OCEAN tokens, and acquire $FET tokens in reliance on the statements in the Vision Paper, Press Release, and various blog posts.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(3) because Defendant is subject to this Court's personal jurisdiction.

## FACTUAL BACKGROUND

### I.     Artificial Intelligence Landscape

25.     Artificial Intelligence has evolved rapidly, becoming a transformative technology in many areas of modern life.  At its core, AI involves the development of technology capable of performing tasks that traditionally require human intelligence, such as visual perception, speech recognition, decision-making, and language translation.

26.     AI is a set of technologies commonly seen in everyday life in the form of generative AI tools such as chatbots and ChatGPT that analyze data via natural language processing to provide quick answers to questions.

27.     Agentic AI represents the next evolution of AI, which can respond, adapt, and make decisions on its own, primarily by analyzing data.  By integrating data from multiple sources, agentic AI can independently analyze challenges, create strategies, and execute tasks in areas such as claims processing, fraud detection and analysis, and administrative healthcare support.

28.     Many governments and companies are racing to develop AI tools that far surpass the current capabilities of generative and agentic AI.  Currently theoretical, the next step in AI development is artificial general intelligence ("AGI"), which would possess human-level cognitive

abilities, capable of understanding, learning, and applying its intelligence to a wide range of problems. Beyond AGI lies artificial super intelligence ("ASI"), which would possess intelligence far surpassing that of the brightest human minds across virtually all fields.

29.     Whether focusing on AI in its current form or exploring the development of AGI and ASI, central to the development of all AI tools is the need for large volumes of data. Datasets are the foundation for training, testing, and improving AI models. They provide the raw material that enables AI systems to learn patterns, make predictions, and perform tasks accurately and reliably. The quality, quantity, and diversity of a dataset directly impact an AI system's performance, as flawed or biased data will lead to flawed and biased results.

30.     Academia, authors, analysts, and Hollywood movie studios have been discussing for decades the potential, geopolitical, commercial, and creative benefits (and risks) posed by AGI and ASI. A central theme is the recognition that dominance of the AGI and ASI space will bestow unprecedented power upon its controllers, whether a specific government agency or a private corporation. This extreme concentration of power could undermine democratic checks and balances, leading to a form of techno-autocracy.

31.     Whoever possesses the largest set of quality data is more likely to develop better AI models and be the first to reach true ASI. This has triggered an arms race between companies and countries to amass extremely large sets of quality data.

32.     The enormous investment and computing power required for advanced AI means big tech companies and governments are at the forefront of AI development. This concentrates both technological capability and expertise in the hands of a few, potentially at the expense of public interests.

33.     Concerned about the enormous concentration of power in the hands of a few, many

individuals and entities have chosen to support an alternative path. This alternative is a future where AI is available to all through a decentralized approach that prevents a few from wielding superior AI power to control the many. For the millions who hold this view, their efforts to support decentralized AI often live at the intersection of investment and altruism. While entities such as Singularity (defined below) and Fetch see this groundswell of concern as an opportunity to harness the efforts of a large disparate group to achieve positive change on a global scale, others like the Defendants see only the opportunity to enrich themselves regardless of the consequences.

## II.    The Decentralized Autonomous Organization As A Model of Governance

34.    The platforms supporting the Alliance—Ocean, Singularity, and Fetch (collectively, the "Platforms")—pursued a widely adopted governance model referred to as a decentralized autonomous organization, or DAO. Entities operating with a DAO governance model agree to abide by a shared code or covenant with the community. This mutually adopted code creates a stable and cohesive network with agreed-upon mechanisms for rewarding contributors to the community and for collective decision-making. Aaron Wright**,** *The Rise of Decentralized Autonomous Organizations: Opportunities and Challenges*, STANFORD JOURNAL OF BLOCKCHAIN LAW & POLICY (2021) at 155, https://stanford-jblp.pubpub.org/pub/rise-of-daos ("Parties that join a DAO agree, in substance, to abide not just by the rule of law, but the rule of code."); Tanusree Sharma, et al., *Future of Algorithmic Organization: Large-Scale Analysis of Decentralized Autonomous Organizations (DAOs)*, arXiv (2024) at 2, https://arxiv.org/abs/2410.13095 ("The process of voting on proposals is central to the governance of DAOs.").

35.    A true DAO governance model, once established, allows community members to engage with the organization by holding the organization's tokens. Tokens are typically acquired

through self-executing "smart" contracts on the blockchain. The DAO token holders may, for example, vote to establish what contributions to the DAO will receive a reward, such as for providing computing power or data to the entire network or contributing certain AI code. Wright at 172.

36.    Tokens must be distinguished from ordinary cryptocurrency. A cryptocurrency, such as bitcoin, is designed to be used as a currency and as a store of value that is native to a certain blockchain. Tokens, however, are often created and built atop a preexisting blockchain for any number of uses, such as representing an interest in a larger asset or project.

37.    Tokens that provide access to services, platforms, or otherwise enable holders to do something are called "utility tokens." Where a utility token is used for DAO governance, the token will typically provide the token holder with the ability to access or participate in the development of an underlying project as well as certain governance rights within the DAO model. Holders of a cryptocurrency like bitcoin do not have any inherent governance rights, as bitcoin was explicitly designed to be used solely as a currency and store of value, and the bitcoin blockchain does not otherwise have protocol-level governance that relies on the amount of bitcoin one holds.

38.    Central to the concept of a decentralized organization is adoption of a governance model that prevents the concentration of power or decision making. This model requires that decisions concerning control over and access to those artificial intelligence programs are managed by the community members. Decision making that is decentralized across a large number of unaffiliated organizations and individuals presents its own logistical issues—principally, how to keep an organization focused and moving forward when there are millions of decision-makers.

39.    Regarding the Alliance, each of the Platforms maintains a "community" of token holders who own utility tokens. For token-gated communities like the Platforms and other DAOs,

the tokens are used to control membership and grant access to exclusive content, events, or benefits. The issuers' tokens act like digital keys, verifying ownership to unlock participation, and can be used for social tokens, nonfugible tokens ("NFTs"), or other blockchain-based assets.

40.    Distinct from a routine membership, tokens maintain characteristics similar to commodities that can be sold or traded on exchanges. The value of utility tokens is largely a function of the perceived strength of the project that is underlying the token, as a utility token ultimately holds value because it can be used within the ecosystem to access certain features. This feature transforms a membership right into an asset for the token holders. This feature helps build loyalty among members by giving them an interest in the community's success, both financially and altruistically.

41.    Tokens, including the tokens issued by the Platforms, are frequently traded on centralized or decentralized platforms, similar to a stock or commodities exchange, though they do not have the same features. Centralized exchanges use deposited funds in an account, manage orders, and match buyers and sellers. On decentralized exchanges ("DEXs"), users connect a cryptocurrency wallet directly to the platform, and a smart contract executes trades from the user's own wallet, which is secured by their private keys.

42.    Once the DAO governance structure has been established, it is typically only the token holders that are able to modify the structure and operation of the organization by voting on proposals concerning the underlying project. By allowing the community to vote on proposals, decision-making is transparent, autonomous, and decentralized. Wright at 160. The stable governance of the DAO also contributes to the stability and success of the DAO's underlying projects and ultimately supports the value of the project's tokens.

III.    **The Platforms**

43.    The Platforms in this case—Fetch, Ocean, and SingularityNET—are three nonprofit organizations founded with parallel missions to foster decentralized AI systems. Each operates with the goal of creating an ecosystem that allows community members to access quality decentralized datasets and build AI systems that are independent from the handful of major AI platforms (like OpenAI, Anthropic, etc.) that currently dominate the AI landscape.

44.    Fetch.ai Foundation Pte. Ltd. ("Fetch") is a non-profit organization incorporated under the laws of Singapore. Fetch was founded in 2017 with the goal of building an open, tokenized, decentralized machine-learning platform that allows users to access secure datasets and leverage its autonomous artificial intelligence to execute tasks. Fetch provides a decentralized AI agent architecture, designed specifically for commercial applications, with significant tooling appropriate for connecting decentralized AI agents to software processes involved in enterprise or SME software systems or end-user interfaces.

45.    Fetch operates a digital utility token, "$FET." The $FET token powers Fetch.ai, a decentralized machine learning platform for applications such as asset trading, gig economy work, and energy grid optimization, and indeed the entire Alliance.

46.    SingularityNET Foundation ("Singularity") is a non-profit organization incorporated under the laws of Switzerland. Singularity was founded in 2017 to advocate for a decentralized approach to AI that emphasizes ethical considerations and community governance.

47.    Singularity provides a decentralized network of AI agents with a connectivity protocol and associated formalisms and languages that enables the agents to assemble into collectives suitable to solve cognitive, mathematical, or application problems.

48.    Singularity provides a blockchain based marketplace and framework for AI

services and operates a digital token, "$AGIX."

49.     Ocean was founded in 2017 to "democratize" data and provide a secure and decentralized platform for data exchange.  Ocean's mission is to create decentralized datasets which members of the Ocean community can use to create agentic AI programs and systems that are independent of any government, military, or corporation.

50.     Ocean operates a digital token, "$OCEAN."

**IV.    Ocean Dedicates A Significant Portion Of Its Token Supply To Community Incentives**

51.      As can be seen with companies such as Apple, Microsoft, and Facebook, the fate of technology companies is often tied to the market perception of their leadership.  The market's perception of the visions laid out by Steve Jobs, Bill Gates, and Mark Zuckerberg were essential to the success of their respective companies.  In the minds of the market, each of these gentlemen was not just the chief executive of a company, but their names were synonymous with the name of the companies they founded.

52.     This trend is also present in the artificial intelligence ecosystem, where certain members of the "AI community" are viewed as visionaries and synonymous with the entities they operate.  Regarding this action, Bruce Pon, Christina Pon, and Trent McConaghy are the founders of Ocean and viewed by the markets as the alter egos of Ocean.  They utterly dominate and control every aspect of Ocean, which exists solely to implement their personal vision for artificial intelligence.  When they speak, they speak for Ocean.  When Ocean speaks, it does so through Bruce Pon, Christina Pon, and McConaghy, parroting their message.  The individual Defendants foster this perception through the extensive use of social media.

53.     Central to the vision of Bruce Pon, Christina Pon, and McConaghy, according to their own statements, is data sharing and monetization within a secure, decentralized framework.

Their purported vision seeks to unlock the value of data, making it accessible for individuals, startups, and large enterprises alike to foster innovation and drive the advancement of AI and machine learning technologies.  This is achieved by providing a platform (Ocean) that allows data owners to share and monetize data, with the goal of addressing the data accessibility challenges in AI and machine learning research.

54.    Distilled to its essence, the Ocean platform is designed to incentivize users to contribute their data for use by members of the community to train AI and machine learning tools. This is done by granting $OCEAN tokens to those who contribute data and AI code, while charging tokens to those who use the data to drive advancements in AI.  In theory, the value of the token will increase with demand, and the demand will increase as the quality and size of the dataset grows.

55.    In a 2021 Ocean press release (the "Press Release"), Ocean announced that it had pledged 180 million of its tokens to the community via grants in an effort to build the network of participants.  Exhibit 5, *Press Release: Ocean Protocol Foundation announces $140 million USD in grants for the community-curated OceanDAO to fund the Web3 Data Economy***,** Ocean Protocol (Oct. 7, 2021), https://oceanprotocol.com/press/2021-10-07-ocean-protocol-foundation-announces-140M-USD/.

56.    On May 22, 2023, the Pons and McConaghy announced their plan to shift Ocean to a DAO structure centered on data farming incentives program.  Exhibit 2, McConaghy, *OceanDAO Is Going Fully Decentralized and Autonomous*.  Whereas Ocean originally attracted consumers to its ecosystem by awarding grants, Ocean's shift to data farming aimed to incentivize users to contribute to the good of the community in exchange for tokens without the need for a central governance structure.  Exhibit 6, Ocean Protocol Team, *Control Over the OCEAN Contract*

*Is Now Revoked: Technical* (May 22, 2023), https://blog.oceanprotocol.com/control-over-the-ocean-contract-to-be-revoked-soon-technical-77cb8923171.

57.    Under the proposed DAO structure, Defendants informed the public at large (including Plaintiffs) and their existing Ocean community that $OCEAN tokens would be automatically and autonomously awarded via "smart contracts" to contributors who satisfied pre-determined requirements.  The tokens awarded for such projects were called "Community Tokens."  When users engaged in activities that enhanced the community, Ocean automatically issued the user a certain amount of $OCEAN Community Tokens as a reward.  Those tokens could then be used to access the community dataset, or they could be exchanged and sold like other tokens.

58.    In representing it planned to transition to a DAO structure, Ocean announced to Plaintiffs it had minted all remaining tokens "for the community; for Data Farming and more." Exhibit 6, *Control Over the OCEAN Contract Is Now Revoked: Technical*.   Ocean's announcements aligned with the organization's stated mission of creating a self-sustaining, autonomous, decentralized AI ecosystem with designated tokens for community generative purposes (i.e. community tokens).    Exhibit 7, *What is Ocean?,* Ocean Protocol, https://docs.oceanprotocol.com/discover/what-is-ocean.  Ocean's transition to a DAO should have marked the end of *any* centralized governance—a goal Ocean had enshrined as essential to its "network goals to be censorship-resistant and trustless."  Exhibit 6, *Control Over the OCEAN Contract Is Now Revoked: Technical*.

59.    In total, the Pons and McConaghy, through Ocean, announced the designation of approximately 700,000,000 $OCEAN tokens as "Community Tokens," which were restricted and could only be distributed as autonomous rewards through designated incentive program to foster

community engagement.

60.    Unlike treasury tokens that belong to the organization and can be sold into the open market, $OCEAN Community Tokens could only enter the market through smart contracts executing designated autonomous incentive programs approved by the community.  Ocean's announcements indicated that any Community Tokens not distributed for this purpose would be burned (i.e., destroyed).  Exhibit 8, *Ocean Protocol: Tools for the Web3 Data Economy, Technical Whitepaper                    Version                    2020-OCT-29*, https://trent.st/content/20201029%20Ocean%20Protocol%20Technical%20Whitepaper.pdf    ("If there aren't enough value-adding projects for the OCEAN funds available, remaining OCEAN gets burned; this therefore sets a baseline for the value-add needed."); Exhibit 9, Ocean Protocol Team, *On Voting In OceanDAO* (July 24, 2023), https://blog.oceanprotocol.com/on-voting-inoceandao-f26700c187a2 (burning of $OCEAN occurs where "any OceanDAO funds not allocated in a given funding cycle, i.e. not enough projects with a sufficient "yes" vote to use up the funds available.").

## V.    The Artificial Superintelligence Alliance And Token Merger

61.    The Platforms announced their joint founding of the Alliance in a vision paper published in April 2024.  Exhibit 10, Artificial Superintelligence (ASI) Alliance Vision Paper (Apr. 2024) (the "Alliance Vision Paper").

62.    The purpose of the Vision Paper was both to announce the launching of the Alliance and to solicit, including in this district, people to acquire, maintain, and eventually convert $OCEAN, $FET, and $AGIX tokens into Alliance tokens.  As a solicitation to the market generally, the authors intended and expected people would rely upon the representations made in the Vision Paper when deciding to acquire, retain, and convert tokens.

63.     The Vision Paper outlines the Platforms' joint mission "to merge their tokenomic networks" to "create the world's largest open source, independent AI research and development foundation – with a unique focus to create decentralized Artificial Superintelligence." *Id.* at 2.

64.     In setting forth its mission statement, the Alliance stressed the "strong potential to generate tremendous economic value and unprecedented good for humans and other sentient beings" which "[t]he founders and active developers of Fetch, SingularityNET and Ocean are excited to have the opportunity to work with the broader community to address . . . and bring the best possible Artificial Superintelligence into reality." *Id.* at 12.

65.     The Platforms believed that combining their communities into one larger community would multiply their open-source AI research and development potential by providing access to a greater amount of data and AI code.

66.     Recognizing that "you can get people to do stuff by rewarding them with tokens," the Alliance elaborated upon its means for achieving this "economic value and unprecedent good," explaining:

> For AI, this means you can get people to contribute to train a model. You can get them to contribute to run inference on a model. You can get people to run agents. You can get them to contribute or curate training data. You can get people to crowd-source predictions. In fact, SingularityNET, Fetch and Ocean have all been doing AI-focused token engineering all along. Now, the three organizations' complementary efforts can become more tightly aligned, manifesting dramatic synergies at the level needed to propel the decentralized AI ecosystem ahead of its centralized competition.

*Id.* at 16.

67.     The Alliance also set forth its position that "[f]using the tokens will provide an economic basis to incentivize and drive tech integration of the three platforms, creating a platform of unprecedented power to work toward beneficial decentralized AGI." *Id.* at 27.

68.     The Alliance agreed to merge Ocean ($OCEAN) and Singularity ($AGIX) tokens

into Fetch ($FET) tokens. The merged tokens were to be renamed $ASI, but continue to trade under Fetch's ticker, $FET. Exhibit 11, *Navigating the ASI Token Merger: A Comprehensive Guide*, Artificial Superintelligence Alliance, https://docs.superintelligence.io/artificial-superintelligence-alliance/archive/navigating-the-asi-token-merger-a-comprehensive-guide.

69. To effectuate the token "merger," Fetch agreed to mint 1,477,549,566 additional $FET tokens for the purpose of allowing $AGIX and $OCEAN token holders to convert their tokens to $FET tokens at a pre-determined conversion rate. Exhibit 12, *FET token supply increased to support forthcoming $ASI token merge,* fetch.ai (May 3, 2024) https://fetch.ai/blog/fet-token-supply-increased-to-support-forthcoming-asi-token-merge.

70. As noted in the Vision Paper, "the token merger is a highly complex operation" that sought to achieve "fairness among the projects and respective communities." Exhibit 10, Alliance Vision Paper, at 27. Central to achieving this fairness was agreeing on an exchange rate for each set of tokens. The Vision Paper detailed the factors taken into consideration by the Platforms when determining the exchange rates.

71. As would be expected, the first factor looked at the fully diluted valuation of the tokens based on the maximum supply identified "as the best like-for like valuation metric in weighing the three tokens for purposes of the merger." The Platforms also agreed to use the 15-day trading average for the three tokens. *Id.* at 27.

72. Taking these factors into consideration, it was agreed that upon completion of the merger, the total supply of $FET tokens was to be 2,630,547,141. *Id.* at 5. This would be comprised of 866,700,367 tokens allocated to Singularity, 1,152,997,575 tokens allocated to Fetch and 610,849,199 tokens allocated to Ocean. *Id.* Mathematically, following the token merger, $OCEAN token holders had the right to receive 0.433226 $FET tokens per $OCEAN token

tendered.   $AGIX token holders had the right to receive 0.433350 $FET tokens per $AGIX token tendered.

**VI.    Defendants' False Statements Regarding Community Tokens**

73.    Many of the details of the token merger, the mechanics for how the merger would be effectuated, and the justification for the Alliance were discussed extensively in various public forums, including on X and other social media, by the Alliance and Defendants. *See, e.g.*, Exhibit 11, *Navigating the ASI Token Merger*; Exhibit 13,   Bruce Pon & Trent McConaghy, *Ocean Protocol is joining the Superintelligence Alliance*, Ocean Protocol (Mar. 27, 2024), https://blog.oceanprotocol.com/ocean-protocol-is-joining-the-superintelligence-alliance-767c82693f24.

74.    One of the reasons that details of the merger process were so widely discussed in public forums was to solicit the affirmative vote of the Fetch and Singularity communities.  This was an explicit condition included in the Vision Paper: "This landmark Superintelligence Alliance to push forward the boundaries of Open Source AI is subject to approval by the Fetch.ai (FET) and SingularityNET (AGIX) community of token holders." *See, e.g.*, Exhibit 14, Ocean Protocol Team, *Superintelligence Alliance Updates to Data Farming and veOCEAN* (Mar. 29, 2024), https://blog.oceanprotocol.com/superintelligence-alliance-updates-to-data-farming-and-veocean-68d7b29c5100; *see also* Exhibit 10, Alliance Vision Paper, at 2.

75.    Importantly, as part of the token merger and vote solicitation process, Defendants promised to the community, including Plaintiffs and other Alliance members, that the Alliance would retain the community incentive designation of approximately 700,000,000 $OCEAN tokens allocated for community purposes by Ocean prior to the token merger after their conversion to $FET tokens.  Exhibit 10, Alliance Vision Paper, at 20.   Defendants' representation that the

$OCEAN Community Tokens would remain for use only in community incentive programs was central to the operation of the combined organization with a true DAO structure.

76.    Ocean thus represented to the public, through the Alliance Vision Paper, that 700,000,000 $OCEAN Community Tokens would remain community tokens and not treasury tokens after implementation of the token merger.  $AGIX tokens similarly retained their usage following the Platforms' entry into the token merger.  Exhibit 10, Alliance Vision Paper, at 21.

77.    In contrast to community tokens, treasury tokens are held and controlled by the foundation (e.g., Ocean).  Defendants knew the $OCEAN Community Tokens were a critical and valuable incentive to entice the public to join the Alliance community.  For instance, in a 2021 press release, Ocean announced that it had pledged 180 million of its tokens to the community via grants in an effort to build the network of participants.  Exhibit 5, *Press Release - Ocean Protocol Foundation announces $140 million USD in grants for the community-curated OceanDAO to fund the Web3 Data Economy*.

78.    As one example of how the $OCEAN Community Tokens worked, on October 13, 2021, Ocean announced that its tenth round of community grant initiatives, which involved 702,963 $OCEAN tokens, had ended. 158,547 $OCEAN had been granted to the community, backing a total of 9 projects.  The remaining 544,416 $OCEAN tokens were "burned" by being sent to an inaccessible crypto wallet.  Exhibit 15, Alex N, *OceanDAO Round 10 Results*, Ocean Protocol,    (Oct.    13,    2021),    https://blog.oceanprotocol.com/oceandao-round-10-results-e6ccb1e86878.

79.    When speaking directly to the community about the benefits of the Alliance and the token merger, Defendants Pon and McConaghy confirmed: "The covenant that we make to you, our community and the Superintelligence Alliance is the same — we will build the tools to

help every human have a chance to thrive in a future where AI, AGI and ASI is a reality." Exhibit 13, *Ocean Protocol is joining the Superintelligence Alliance.*  A central pillar of that covenant was the DAO structure and maintaining of $OCEAN Community Tokens that were restricted and could only be distributed as autonomous rewards through incentive programs designated by the Alliance to foster community engagement.

80.    In addition to the Vision Paper, Defendants participated in the dissemination of other public statements confirming that the $OCEAN Community Tokens were to be contributed to the Alliance and would remain community tokens – not treasury tokens.  *See, e.g.*, Exhibit 14, *Superintelligence Alliance Updates to Data Farming and veOCEAN* (representing that, upon a "yes" vote by Fetch and Singularity token holders, "Ocean Protocol Foundation will re-use the [data farming] budget for its incentives programs" including "new projects that arise from synergy among Fetch, Singularity NET, and Ocean.").

81.    The reservation of certain tokens for community incentives (*i.e.*, community tokens) was a critical factor incentivizing community approval of the Alliance ecosystem, which was voted upon by Fetch and Singularity token holders.  Exhibit 10, Alliance Vision Paper, at 2. In direct reliance upon the public statements by Defendants regarding the contribution of the $OCEAN Community Tokens for the betterment of the Alliance community, the Fetch and Singularity communities approved the token merger.  These communities would not have approved the token merger had Defendants disclosed their intention to transfer the $OCEAN Community Tokens to an entity controlled by Defendants (Ocean Expeditions), convert the tokens into $FET tokens, and then sell a massive quantity of those $FET tokens into the open market before exiting the Alliance.

82.    Defendant McConaghy also advocated for the token merger, posting to Twitter on

March 27, 2024 that:

> Ocean, Fetch and SingularityNET are uniting to create the Artificial Superintelligence Alliance. Why? Because we need to accelerate and scale up, so that *decentralized* ASI wins. So that humanity wins. . . Decentralized AI needs to compete. To compete, it needs scale. It needs to get *faster* and *bigger*. How? *Merge* our tokens. Align our incentives then amp them up. Draw on our respective strengths. Scale up compute and energy. Race *together*. All with the aim to build *decentralized* Artificial Superintelligence. It's a race to AGI & ASI. Centralized, vs Decentralized. Winner-take-all, vs level playing field. Which future do you prefer? With this move to increase speed and scale, we are putting decentralized ASI in the game. For all our sakes.

Exhibit 16, Trent McConaghy (@trentmc0), X, *Ocean, Fetch and SingularityNET are uniting to create the Artificial Superintelligence Alliance* . . ., (Mar. 27, 2024 at 13:01 ET), https://x.com/trentmc0/status/1773032561205285001.

83.    Once the token merger was approved, members of the Fetch and Singularity communities similarly relied upon Defendants' statements when determining to hold and/or convert their tokens into $FET tokens (as applicable). Likewise, holders of $FET and $AGIX tokens relied upon Defendants' statements regarding the $OCEAN Community Tokens when deciding to continue holding and utilizing their tokens following the approval of the token merger.

**VII.    Ocean Sabotages, And Ultimately Exits, The Alliance**

84.    Pon and McConaghy were apparently unwilling to stand behind their promises to maintain a true DAO structure in both the Vision Paper and in various other public statements. Instead, they carried out a scheme to enrich themselves at the expense of the class members and the Alliance community in breach of the publicly affirmed covenant set out in the Alliance Vision Paper.

85.    A critical aspect of the Defendants' scheme was gaining access to a materially larger pool of tokens so that when they liquidated the $OCEAN Community Tokens, contrary to

their promises, they could do so in a way that did not immediately eviscerate token prices. Prior to the token merger, Ocean simply did not have enough tokens in circulation to allow them to liquidate the $OCEAN Community Tokens. In contrast, following the token merger, there was enough liquidity in $FET such that Defendants were able to convert the $OCEAN Community Tokens into $FET tokens, which were circulating in significantly larger numbers as a result of the token merger.

86.     Having secured admittance into the Alliance through false pretenses and statements to the Fetch and Singularity communities noted herein, Defendants were positioned to implement the next step in their scheme. This included Defendants secretly setting up an offshore conduit to effectuate the transfer of hundreds of millions of $OCEAN Community Tokens.

87.     After months of planning, Defendants incorporated Ocean Expeditions in the Cayman Islands on June 27, 2025, with Bruce Pon (Ocean's co-founder) as its sole director. Three days later, Defendants transferred all OceanDAO assets to Ocean Expeditions, including hundreds of millions of $OCEAN Community Tokens. Through that transfer, Defendants via Ocean Expeditions also gained control over all keyholders of the wallet housing the $OCEAN Community Tokens.

88.     Defendants did not seek or obtain the consent of the token holder community before unilaterally transferring the $OCEAN Community Tokens to Ocean Expeditions. Though Ocean had claimed that OceanDAO was a decentralized, autonomous organization, the transfer of all of OceanDAO's assets to Ocean Expeditions by Defendants (and without any community involvement whatsoever) demonstrates that OceanDAO was never actually a decentralized, autonomous organization—it was under the complete control of Defendants. By transferring the $OCEAN Community Tokens to Ocean Expeditions, Defendants explicitly breached their public

statements, covenant to the token holder community, and their express obligations to facilitate the transfer of $OCEAN Community Tokens into $FET tokens.

89.    Seeing an opportunity to line their pockets will ill-gotten gains and quash a future competitor, Defendants struck.  After transferring over 660 million $OCEAN Community Tokens to Ocean Expeditions, beginning on or around July 1, 2025, Defendants began to convert massive amounts of those tokens into Alliance tokens (ASI tokens trading under the $FET symbol).

90.    Following July 1, 2025, Defendants, directly or through Ocean and/or Ocean Expeditions, converted 661,218,319 $OCEAN Community Tokens into 286,456,967.46 $FET tokens.  To put the size of this conversion into perspective, the Defendants converted a greater number of $OCEAN Community Tokens as part of their scheme than had been converted in the entire year prior.

91.    Defendants did not seek or obtain the consent of the token holder community or the Alliance Council before unilaterally converting the $OCEAN Community Tokens into $FET tokens.  This violated core tenets of the covenant Defendants made to the Plaintiffs and the public at large to preserve the $OCEAN Community Tokens for community incentive programs and to establish a decentralized, autonomous governing structure that was not controlled by insiders.

92.    Defendants converted the $OCEAN Community Tokens into $FET tokens for their own benefit and because it was the only way to abscond with the $OCEAN Community Tokens.  As a result of the token merger, Ocean lost 90% of its liquidity and exchange pairs.  Exhibit 17, Bruce Pon, *The ASI Alliance from Ocean's Perspective*, Ocean Protocol (Oct. 23, 2025), at 41 https://blog.oceanprotocol.com/the-asi-alliance-from-oceans-perspective-f7848b2ad61f.    As Bruce Pon recently admitted, Defendants "had only one way out and that was to convert $OCEAN [Community Tokens] to $FET." *Id.* at 41.  In other words, according to Pon, using Ocean

Expeditions to convert the $OCEAN Community Tokens to $FET tokens and liquidate the $FET tokens was critical to Defendants' scheme to enrich themselves.

93.     Once converted into $FET tokens, Defendants proceeded to liquidate the tokens on the open market for their own financial gain.  These acts were unauthorized and unapproved by the Alliance Council or the token holder community.  Those acts were also in contravention of Defendant's obligations to the community to facilitate the transfer of $OCEAN Community Tokens into an equal number of $FET tokens for the betterment of the community.

94.     Yet again, Defendants did not seek or obtain the consent of the Alliance Council or the token holder community before unilaterally selling the $OCEAN Community Tokens—which Defendants repeatedly stated were set aside for the benefit of the community—and retaining the proceeds for their own benefit.

95.     Upon information and belief, after July 1, 2025, Defendants converted and then sold approximately 263 million $FET tokens into the open market.  This represents more than 10% of the total circulating supply of approximately 1.8 billion $FET tokens.  The $OCEAN Community Tokens were not granted to any entities developing code, facilitating AI research, or for other purposes accretive to the community.  These transactions were merely done to convert $OCEAN Community Tokens so they could be liquidated at a higher price for the direct financial gain of the Defendants at the direct expense of the Plaintiff class.  It is unclear precisely how many tokens were ultimately sold into the market by Defendants because the tokens were first sent to wallets where they cannot be traced.

96.     After extracting significant value from the Alliance and its token ecosystem, Defendants abruptly withdrew from the Alliance on October 8, 2025.  This withdrawal was executed without notice to Alliance members and reflected the culmination of Defendants' scheme

to fraudulently secure a financial gain at the expense of the class.  These actions have shattered trust in the Alliance generally and threatened the project's goals to foster decentralized AI development.

97.     Defendants have now chosen to revive the native $OCEAN token and to drive up the value of that token at the expense of the Alliance community.    In its October 9, 2025 withdrawal announcement, Ocean made clear that it planned to use its ill-gotten funds to "buyback and burn $OCEAN" to effect "a permanent and continual supply reduction of the $OCEAN supply."  Exhibit 18, Ocean Protocol Team, *Ocean Protocol Foundation withdraws from the Artificial Superintelligence Alliance* (Oct. 9, 2025), https://blog.oceanprotocol.com/ocean-protocol-foundation-withdraws-from-the-artificial-superintelligence-alliance-4619c4604ea3. These are widely known in the cryptocurrency world as measures aimed at generating an appreciation in the value of the relevant token.

98.     While Defendants have publicly claimed in the October 9, 2025, announcement that the buyback of $OCEAN tokens will be funded by "profits from spin-outs of Ocean derived-technologies", no evidence exists to validate this claim.  *See id.*  What is apparent is that Defendants, together with Ocean Expeditions, have come into substantial funds from the recent mass liquidations of $FET tokens.  In all likelihood, these liquidations (which depressed the value of the $FET token) were undertaken to, at least in part, finance the measures designed to lift the value of $OCEAN tokens.  Many of these tokens are held and controlled by Defendants.

99.     On the demand side, the manner of Ocean's announced exit coupled with its recent public critiques of the Alliance was evidently calculated to—and did in fact cause—a collapse in the public's faith in the Alliance and, by extension, the $FET token. Defendants hoped that by creating a crisis of confidence, $FET token holders (in particular former $OCEAN token holders)

would sell off their $FET token holdings and (re)acquire $OCEAN tokens instead. One particular statement in Ocean's October 9, 2025 announcement was a dog whistle to this effect: "As independent economic actors, former $OCEAN holders can fully decide to continue to hold $FET or not." Exhibit 18, *Ocean Protocol Foundation withdraws from the Artificial Superintelligence Alliance.* The intended result was an increase in the take-up rate of $OCEAN tokens and consequent appreciation in the token's value at the expense of the $FET token.

## VIII. The Alliance Community Suffers Significant Harm

100. Defendants' egregious conversion of $OCEAN Community Tokens and dumping of $FET tokens has caused significant harm to the Alliance community and members of the class. Defendants' actions undermined the entire purpose of the Alliance and devalued the class members' tokens. It was also completely at odds with Defendants' representations and covenants with the community made in the Vision Paper and other public statements.

101. The most obvious harm to the class was financial. Class members acquired, held and/or converted their tokens based on the Defendants' express promises to maintain approximately 700,000,000 tokens as community tokens that could not be liquidated like treasury tokens. *See* Exhibit 10, Alliance Vision Paper, at 20. Once it became apparent that Defendants dumped hundreds of millions of $OCEAN Community Tokens (and left the Alliance), the $FET tokens experienced a dramatic decrease in value. This result was inevitable and known to Defendants based on simple supply and demand principles.

102. Compounding the immediate financial losses, Defendants' actions occurred within a highly competitive and rapidly evolving industry. The rapid liquidation of a large position by a founding member of the Alliance was interpreted by some in the markets and the AI community at large as a lack of confidence in the Alliance's mission.

103.    The fact that Defendants took these actions unilaterally, in violation of the professed decentralization and autonomous governance structure, created a crisis of confidence as to whether the Alliance could function properly.  $FET token holders no longer have confidence that the Alliance will function as promised—with the community having decision-making input through token holder voting.  Once trust in the Alliance has been broken, it risks creating a vicious cycle where it becomes more difficult to incentivize people to contribute to the Alliance, which only further discourages people from holding tokens and remaining involved in the community.

104.    To others, Ocean's departure, lacking any formal explanation, gave rise to widespread speculation there was dysfunction within the Alliance.  As a direct result of this uncertainty, numerous token holders opted to divest from $FET and migrate their asset holdings to alternative tokens.

105.    The lack of confidence caused by Defendants' actions further depressed $FET token prices and left the remaining alliance members unable to fulfill the Alliance's stated mission. This resulted in even more reputational damage that undermined the Alliance and the very concept of creating an open source, independent AI research and development foundation.

106.    In addition to the immediate negative impact on $FET token prices, Defendants' conduct deprived the Alliance of a key tool necessary to achieve the collective vision of the community.  Defendants represented that hundreds of millions of $OCEAN Community Tokens, worth well over $100,000,000, would be restricted and used exclusively as community incentives designed to build a stronger Alliance.  Instead, Defendants converted the $OCEAN Community Tokens for personal gain, depriving the Alliance ecosystem of critical tokens needed to incentivize community members to contribute data, develop code, and otherwise provide accretive benefits to the community.  By Defendants embezzling the $OCEAN Community Tokens, community

members were less incentivized to contribute AI code and data to the Alliance community, because to the extent there were community tokens left to be awarded, they would be worth far less when converted to $FET tokens.

107.    Finally, the Defendants have done tremendous damage to the trust in the community.  Defendants represented they sought a decentralized and autonomous community that would foster innovation and equal access to artificial intelligence.  Instead, by breaking their core promise to the community and dumping the $OCEAN Community Tokens in a bid to enrich themselves, faith that the Alliance can succeed has been destroyed, causing significant reputational and economic harm.

108.    As Defendants secretly began flooding the market with the converted $FET tokens, the price decreased to approximately $0.58 on the day before Ocean publicly exited the Alliance. Since then, $FET tokens have fallen to a low of approximately $0.23 as of October 22, 2025, and as of the date of this Complaint still trade near this price.

109.    The significant drop in the price of $FET, like the prior increase, was reflective of the community's confidence in the Alliance.  After Ocean left the Alliance and it was revealed that the $OCEAN Community Tokens (a critical aspect underlying the Alliance's mission and success) had been liquidated, confidence in the Alliance and its tokens collapsed.

110.    The cause and effect of Defendants' behavior on the price of $FET tokens is beyond dispute.  If one queries Google – "Why has Fetch.ai dropped so much?" the answer you receive is "Ocean Protocol's exit from the Alliance caused Fetch.ai's token to drop by nearly 10%."

111.    Members of the class, which include thousands of small-time token holders and members of the public who want to support the Alliance's goal of decentralized AI, suffered significant harm as a direct result of Defendants' actions.  Defendants' actions devalued the class

members' tokens and hobbled, economically and reputationally, the Alliance in which they participated. The class members have also been harmed because the underlying asset that they supported—based on Defendants' covenant with the community—has been stripped of one of the core assets that is capable of incentivizing community participation (community tokens) and is now embroiled in a crisis of confidence.

## CLASS ACTION ALLEGATIONS

112. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), on behalf of all token holders who acquired, held or converted $FET tokens in reliance on Defendants' representations regarding the Alliance, the token merger, and the designation and use of $OCEAN Community Tokens, as well as voted to admit Ocean into the Alliance (the "Class").

113. Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with any Defendant, including the immediate family members of the Individual Defendants.

114. Plaintiffs reserve the right to amend, modify, change, or expand the Class definitions based on further investigation and discovery.

115. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is currently unknown to Plaintiffs, though upon information and belief, it is likely to be in the hundreds of thousands of token holders across multiple jurisdictions. Members of the Class may be identified through wallet addresses stored on the blockchain ledger and notified of the pendency of this action by publication and/or electronic mail using a form of notice customarily used in class actions.

116. Plaintiffs' claims are typical of the claims of Class members as all Class members

are similarly affected by Defendants' wrongful and illegal conduct. Plaintiffs do not have any interests adverse to the Class. Plaintiff and Class members suffered similar harm as a result of Defendants' conversion and liquidation of tokens reserved for the benefit and development of the Alliance community.

117. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to those of the Class and have retained counsel competent and experienced in class actions and litigation, including in the artificial intelligence space.

118. Common questions of law and fact exist for each cause of action and predominate over any questions solely affecting individual Class members, including but not limited to:

- Whether Defendants made fraudulent material misrepresentations to the Alliance community regarding the designation and use of $OCEAN Community Tokens;

- Whether Defendants breached contractual obligations to the Class by converting $OCEAN Community Tokens into $FET treasury tokens and liquidating the same for their own personal enrichment prior to exiting the Alliance;

- Whether members of the Class suffered damages as a result of Defendants' wrongful conduct in violation of state law.

119. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, a class action will avoid the risk of inconsistent adjudications across the varying jurisdictions in which members of the Class reside.

120. There will be no difficulty in the management of this litigation as a class action.

## COUNT I
### (Fraud)

121. Plaintiffs repeat and reallege the allegations contained in the paragraphs above as

if stated fully herein.

122.    Defendants made public statements and representations, including in the Vision Paper and in various press releases describing the token merger and the Alliance, and Defendants confirmed they operated a DAO with the goal of developing open-source AI, and that approximately 700,000,000 $OCEAN Community Tokens would remain designated for Alliance community incentives after the token merger, and would not be converted or liquidated into treasury tokens.

123.    Defendants further represented that the $OCEAN Community Tokens would only be distributed to individuals in the community that were pursuing the community's goal of developing decentralized, open-source artificial intelligence.

124.    Defendants Pon and McConaghy represented in a May 22, 2023 blog post that they would shift Ocean into a DAO with no central governance structure, and that the remaining $OCEAN Community Tokens would be awarded to community members through autonomous smart contracts in exchange for advancing the community's goals.

125.    Defendants further represented in the Vision Paper that Ocean would join a merged token network with Singularity and Fetch, that the three entities would form a decentralized community, and that this community would be monitored and guided by the Alliance.

126.    Defendants knew or should have known these representations were false, as they secretly planned to liquidate the $OCEAN Community Tokens for their own benefit. Indeed, Defendants' misrepresentations to the community, made shortly before Defendants' began converting the $OCEAN Community Tokens and then dumping them into the market, is clear evidence of Defendants' fraudulent scienter. Defendants' scienter is further evidenced by the fact that after exiting the Alliance, Ocean used the funds from liquidating the $OCEAN Community

Tokens that were converted to $FET in order to buy back its own $OCEAN tokens, and then revive the $OCEAN token.

127.    Defendants made these public statements to induce Plaintiffs and other Alliance community members to approve the token merger and to acquire, hold, and convert ASI tokens.

128.    Plaintiffs and Class members relied on these representations when voting to approve the token merger and in acquiring, holding, and converting ASI tokens.

129.    Plaintiffs and Class Members suffered financial harm when Defendants converted the $OCEAN Community Tokens to $FET and liquidated them on the mass market for their own personal enrichment, depressing the value of the $FET token and attacking the very core of the Alliance's mission to encourage the development of decentralized AGI.

## <u>COUNT II</u>
(Civil Conspiracy)

130.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

131.    Defendants agreed amongst themselves and acted in concert to make public statements and representations, including in the Vision Paper and in various press releases describing the token merger and the Alliance, that they operated OceanDAO with the goal of developing open-source AI, and that approximately 700,000,000 $OCEAN Community Tokens would remain designated for Alliance community incentives after the token merger, and would not be converted or liquidated into treasury tokens.

132.    Defendants agreed amongst themselves and acted in concert to represent that the $OCEAN Community Tokens would only be distributed to individuals in the community that were pursuing the community's goal of developing decentralized, open-source artificial intelligence

133.    Defendants agreed amongst themselves and acted in concert to make public statements to induce Plaintiffs and other Alliance community members to approve the token merger and to acquire, hold, and convert $FET tokens.

134.    Defendants intended and knew that Plaintiffs and Class members would rely on these representations when voting to approve the token merger and in acquiring, holding, and converting $FET tokens.

135.    Defendants knew that their public statements and representations were false when made.

136.    Defendants agreed amongst themselves and acted in concert to convert the $OCEAN Community Tokens into $FET tokens, and thereafter acted in concert to sell the $FET tokens for their own benefit.

137.    Defendants then agreed amongst themselves and acted in concert to use the funds they obtained from liquidating the $OCEAN Community Tokens that were converted to $FET tokens and sold in order to buy back $OCEAN tokens and revive the value of the $OCEAN token.

138.    Despite their prior statements and representations, Defendants had the common purpose of unlawfully converting the $OCEAN Community Tokens into $FET tokens, and thereafter selling the $FET tokens, for their own benefit.

139.    Plaintiffs and Class Members suffered financial harm when Defendants converted the $OCEAN Community Tokens to $FET tokens and liquidated them on the mass market for their own personal enrichment.

## <u>COUNT III</u>
(New York General Business Law §§ 349, 350)

140.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as

if set forth fully herein.

141.    New York General Business Law ("GBL") § 349 prohibits "deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State.

142.    GBL § 350 likewise prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State.

143.    Defendants have engaged in deceptive acts and practices and in false advertising by making public statements and representations, including in the Vision Paper and in various press releases, describing the token merger and the Alliance, claiming that they operated OceanDAO as a true DAO with the goal of developing open-source AI, and promising that approximately 700,000,000 $OCEAN Community Tokens would remain designated for Alliance community incentives after the token merger, and would not be converted or liquidated into treasury tokens.

144.    Defendants' statements and representations were materially misleading because, contrary to those statements and representations, Ocean DAO was not a true DAO, Defendants controlled the $OCEAN Community Tokens, Defendants converted the $OCEAN Community Tokens into $FET tokens, and thereafter Defendants acted in concert to sell the $FET tokens for their own benefit.

145.    Defendants intended and knew that any consumer who read or heard Defendants' statements and representations would rely on Defendants' representations.  Defendants also intended and knew that Plaintiffs and Class members would rely on these representations when voting to approve the token merger and in acquiring, holding, and converting $FET tokens.

146.    Plaintiff and Class members relied on Defendants' statements and representations

when voting to approve the token merger and in acquiring, holding, and converting $FET tokens.

147.    Defendants' consumer-oriented statements, representations, and actions were materially deceptive, unfair, and misleading in violation of GBL § 349.

148.    Defendants' promotional statements, information, and materials that they disseminated to the public at large, potential acquirers of $OCEAN and $FET tokens, and to Plaintiffs and Class members, were materially misleading in violation of GBL § 350.

149.    Defendants' acts were willful and intentional, justifying punitive damages.

**COUNT IV**
(Breach of Contract)

150.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

151.    Through the Alliance Vision Paper and public statements surrounding the token merger and formation of the Alliance, Defendants solicited Plaintiffs and Class members to enter into a covenant to build a community devoted towards developing decentralized AGI by approving the token merger and holding or acquiring ASI tokens.  Defendants further solicited Plaintiffs and Class members to enter into that covenant by offering to reserve the $OCEAN Community Tokens as incentives to the community and to support the community's projects.

152.    By approving the token merger and acquiring, holding, and converting ASI tokens, Plaintiffs and Class Members accepted this solicitation, thereby creating a binding contract.

153.    Defendants breached the contract by failing to preserve $OCEAN Community Tokens for the development of decentralized AGI, the core of the offer that was accepted by Plaintiffs and Class Members in approving the token merger and acquiring, holding and converting $FET tokens.  Defendants instead converted those tokens for their own personal enrichment.

154.    Plaintiffs and Class Members suffered financial and reputational harm as a result

of Defendants' breach.

## COUNT V
(Breach of Covenant of Good Faith and Fair Dealing)

155.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

156.    As set forth above, the Alliance Vision Paper and Defendants' public statements surrounding the Alliance and token merger established contractual obligations to Plaintiffs and the Class Members.

157.    Every contract includes an implied covenant of good faith and fair dealing, requiring that neither party act to undermine the contract or prevent the other party from receiving the benefit of his bargain.

158.    Defendants acted in bad faith by secretly converting $OCEAN Community Tokens to $FET tokens and liquidating those tokens without seeking the approval of the Alliance community.  In doing so, Defendants acted in bad faith with the improper motive of enriching themselves at the expense of Plaintiffs and Class members, in express contravention of the founding principles of the Alliance, and in express contravention of its assertions that it was a DAO.

159.    Defendants' wrongful actions prevented Plaintiffs and Class members from realizing the benefits of the contract because Defendants' flooding of the market with $FET tokens and abrupt exit from the Alliance depressed the value of the $FET token and cast doubt as to the viability of the Alliance to achieve its mission going forward.

## COUNT VI
(Promissory Estoppel)

160.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as

if stated fully herein.

161.    Defendants made clear, unambiguous promises in public statements and through the Alliance Vision Paper that $OCEAN Community Tokens would remain designated for community incentives.  For instance, Defendants McConaghy and Pon promised in a blog post on May 22, 2023 that Ocean would be transformed into a DAO with no central governance structure, and that all remaining $OCEAN tokens had been minted "for the community." Defendants further promised in the Press Release, the Vision Paper, and in other statements, that 700,000,000 $OCEAN tokens would remain reserved for the community's benefit and for incentive programs.

162.    Plaintiffs and Class members reasonably relied on these promises when voting in favor of the token merger, acquiring, holding, and converting tokens, and participating in the Alliance.

163.    Plaintiffs and Class members suffered injury as a result of Defendants' failure to honor their promises by failing to transform Ocean into a DAO, retaining central governance over Ocean, and converting and liquidating $OCEAN Community Tokens for their own personal enrichment, causing irrevocable reputational and financial harm to the Alliance.

164.    Defendants should be estopped from converting any additional $OCEAN tokens to $FET tokens, and be estopped from liquidating or transferring any of the $OCEAN tokens that have already been converted to $FET tokens.

## **JURY DEMAND**

165.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial as to all issues triable by jury.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class, demand a judgment against Defendants

as follows:

A. Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

B. Declaring that Defendants' actions, as set forth above, violate the state laws set forth above;

C. Awarding compensatory, special, consequential, treble, punitive and exemplary damages against Defendants in an amount to be determined at trial;

D. Awarding equitable and injunctive relief, including, without limitation, recission, restitution, and disgorgement;

E. Awarding statutory relief under state law;

F. Awarding reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

G. Awarding pre-judgment and post-judgment interest; and

H. Granting such other and further relief as the Court deems necessary and proper

Dated: November 4, 2025                    **K&L GATES LLP**

*/s/ Thomas A. Warns*
Steven L. Caponi (*Pro Hac Vice Forthcoming*)
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
Steven.Caponi@klgates.com

Edward Dartley
Thomas A. Warns
599 Lexington Avenue
New York, NY 10022
Phone: (212) 536-3900
Ed.Dartley@klgates.com
Tom.Warns@klgates.com

Kendall Huennekens
134 Meeting Street, Suite 500
Charleston, SC 29401
Phone: (843) 579-5601

Kendall.Huennekens@klgates.com

*Counsel for Plaintiffs*