**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Fetch Compute, Inc., Seth Ian, Greg Graves, Victor Larivee, individually and on behalf of all others similarly situated,<br><br>          *Plaintiffs*,<br>   v.<br><br>Bruce Pon, Trent McConaghy, Christina Pon, Ocean Protocol Foundation Ltd., Ocean Expeditions Ltd., and OceanDAO,<br><br>          *Defendants*. | CASE NO.: 1:25-cv-9210-DEH<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR, IN THE ALTERNATIVE, <u>FOR FAILURE TO STATE A CLAIM</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     STANDARD OF REVIEW ................................................................................. 4

        A.      Rule 12(b)(2)—Motion to Dismiss for Lack of Personal Jurisdiction ...................4

        B.      Rule 12(b)(6)—Motion to Dismiss for Failure to State a Claim ............................5

III.    PLAINTIFFS HAVE MADE A PRIMA FACIE SHOWING OF PERSONAL
        JURISDICTION OVER ALL DEFENDANTS................................................... 6

        A.      Defendants Transacted Business in New York Under CPLR § 302(a)(1)...............6

                1.      Defendants' Retention and Use of New York Professionals Was Integral
                        to the Alleged Scheme ....................................................................8

                2.      Defendants Solicited New York Token Holders Through a Campaign
                        Directed at Securing Support for the Token Merger and Alliance ...........14

        B.      Jurisdiction Also Exists Under CPLR § 302(a)(3)(ii)............................................15

                1.      Defendants Committed Tortious Acts Causing Injury In New York ........15

                2.      Defendants Reasonably Should Have Expected Their Conduct To Have
                        Consequences In New York......................................................16

                3.      Defendants Derive Substantial Revenue From Interstate Or International
                        Commerce ...................................................................17

        C.      Personal Jurisdiction Is Proper Over the Individual Defendants and DAO
                Defendants .................................................................17

        D.      Exercising Jurisdiction Comports With Due Process ...........................................20

        E.      Defendants' Declarations Do Not Defeat Jurisdiction.........................................22

        F.      At Minimum, Plaintiffs Are Entitled to Jurisdictional Discovery ........................23

IV.     THE CAC STATES VIABLE CLAIMS UNDER RULE 12(B)(6)............................... 24

        A.      The CAC Does Not Impermissibly Group Plead....................................................24

        B.      Count One—Fraud..................................................................................................26

                1.      The CAC Alleges Misrepresentations That Were False When Made .......26

                2.      Scienter is Well-Pled, and the Inference of Scienter is Reasonable .........28

3. Plaintiffs Allege Reliance ....................................................................30

4. The Complaint Alleges Injury and Causation...........................................31

C. Count Two—Civil Conspiracy ...........................................................................32

D. Count Three—GBL §§ 349 and 350....................................................................34

E. Counts Four and Five—Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing ...................................................................................35

1. The Vision Paper and Alliance Statements May Constitute an Enforceable Contract or Create Enforceable Obligations ..............................................35

2. The Covenant of Good Faith and Fair Dealing Claim Survives If Any Contractual Relationship Exists.................................................................37

F. Count Six—Promissory Estoppel ..........................................................................38

G. Alter Ego Allegations Are Sufficiently Pled ........................................................39

V. CONCLUSION................................................................................................................ 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
633 F. Supp. 2d 15 (S.D.N.Y. 2009)........................................................................29

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
884 F.2d 69 (2d Cir. 1989).......................................................................................38

*Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Com.*,
265 A.D.2d 513 (2nd Dep't 1999) ......................................................................37, 38

*Barron v. Helbiz Inc.*,
No. 20 CIV. 04703 (LLS), 2023 WL 5672640 (S.D.N.Y. Sept. 1, 2023) .........................37

*Basic v. BProtocol Found.*,
No. A-23-CV-533-RP, 2024 WL 4113751 (W.D. Tex. July 31, 2024), *R&R adopted*, No.
1:23-CV-533-RP, 2024 WL 4113024 (W.D. Tex. Sept. 6, 2024), *vacated in part,* No.
1:23-CV-533-RP, 2024 WL 6077793 (W.D. Tex. Dec. 16, 2024)...................................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................5

*Bensusan Restaurant Corp. v. King*,
126 F.3d 25 (2d Cir. 1997).......................................................................................17

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015).......................................................................................5

*Camacho v. Northeastern Univ.*,
No. 18 Civ. 10693 (ER), 2019 WL 5190688 (S.D.N.Y. Oct. 15, 2019)..............................4

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018)...................................................................................18, 19

*Chill v. General Elec. Co.*,
101 F.3d 263 (2d Cir. 1996)......................................................................................28

*Cimen v. HQ Capital Real Estate, L.P.*,
227 A.D.3d 587 (1st Dep't 2024) .............................................................................27

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013)......................................................................................34

*Daventree Ltd. v. Republic of Azer.*,
349 F. Supp. 2d 736 (S.D.N.Y. 2004).........................................................................5

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*,
    7 N.Y.3d 65 (2006) ................................................................................................6, 7

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*,
    797 N.Y.S.2d 439 (1st Dep't 2005), *aff'd*, 7 N.Y.3d 65, 850 N.E.2d 1140 (2006).....12, 13

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013).................................................................................4, 22, 23

*ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC*,
    50 A.D.3d 397 (1st Dep't 2008) ...............................................................................27

*First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*,
    52 F. Supp. 3d 625 (S.D.N.Y. 2014)............................................................................5

*Fischbarg v. Doucet*,
    9 N.Y.3d 375 (2007) ................................................................................................11

*Flores v. Lower E. Side Serv. Ctr., Inc.*,
    4 N.Y.3d 363 (2005) ................................................................................................36

*In re Fyre Festival Litig.*,
    2019 WL 5799762 (S.D.N.Y. Nov. 7, 2019).............................................................31

*Giuliano v. Barch*,
    No. 16 CV 0859 (NSR), 2017 WL 1234042 (S.D.N.Y. Mar. 31, 2017) .........................19

*Gomez-Jimenez v. New York Law School*,
    103 A.D.3d 13 (1st Dep't 2012) ................................................................................27

*Goshen v. Mut. Life Ins. Co. of New York*,
    98 N.Y.2d 314 (2002) ..............................................................................................34

*Grant Industries, Inc. v. Isaacman*,
    2022 WL 2358422 (D.N.J. June 30, 2022)..................................................................25

*Grewal v. Cuneo Gilbert & LaDuca LLP*,
    No. 13-CV-6836 (RA), 2018 WL 4682013 (S.D.N.Y. Sept. 28, 2018), *aff'd*, 803 F.
    App'x 457 (2d Cir. 2020) .........................................................................................36

*Hollins v. U.S. Tennis Ass'n*,
    469 F. Supp. 2d 67 (E.D.N.Y. 2006) ...........................................................................4

*Int'l Customs Assocs., Inc. v. Ford Motor Co.*,
    893 F. Supp. 1251 (S.D.N.Y. 1995), *aff'd*, 201 F.3d 431 (2d Cir. 1999)........................13

*JihShyr Yih v. Taiwan Semiconductor Mfg. Co.*,
    No. 18-cv-3844 (VEC), 2019 WL 2578306 (S.D.N.Y. June 24, 2019) ...........................13

*Kamal v. Pressler, Felt & Warshaw, LLP,*
    No. 23-CV-10487 (MKV), 2025 WL 919505 (S.D.N.Y. Mar. 25, 2025) ..........................4

*Karlin v. IVF Am. Inc.,*
    93 N.Y.2d 282 (1999) ................................................................................................34

*Kiseleva v. Greenspan,*
    755 F. Supp. 3d 367 (S.D.N.Y. 2024) .......................................................................18

*Kowalchuk v. Stroup,*
    61 A.D.3d 118 (N.Y. App. Div. 1st Dep't 2009) .....................................................36

*Kreutter v. McFadden Oil Corp.,*
    71 N.Y.2d 460 (1988) ................................................................................................20

*LaMarca v. Pak-Mor Mfg. Co.,*
    95 N.Y.2d 210 (2000) ................................................................................................15

*Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC,*
    2015 WL 769573 (S.D.N.Y. Feb. 24, 2015) ............................................................31

*Licci v. Lebanese Canadian Bank, SAL,*
    20 N.Y.3d 327 (2012) ..................................................................................................7

*Marine Midland Bank, N.A. v. Miller,*
    664 F.2d 899 (2d Cir. 1981) ........................................................................................4

*Matana v. Merkin,*
    989 F. Supp. 2d 313 (S.D.N.Y. 2013) ......................................................................31

*McPherson v. Baltimore Police Dep't,*
    494 F. Supp. 3d 269 (D. Md. 2020) ....................................................................24, 25

*Meisel v. Grunberg,*
    651 F. Supp. 2d 98 (S.D.N.Y. 2009) ........................................................................33

*Moore v. PaineWebber, Inc.,*
    306 F.3d 1247 (2d Cir. 2002) ....................................................................................31

*Ortiz v. Consol. Edison Co. of New York, Inc.,*
    801 F. Supp. 3d 260 (S.D.N.Y. 2025) ......................................................................24

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.,*
    85 N.Y.2d 20 (1995) ............................................................................................34, 35

*Pers. Watercraft Prod. SARL v. Robinson,*
    No. 16-CV-9771, 2017 WL 4329790 (S.D.N.Y. Sept. 1, 2017) ................................38

*In re Platinum & Palladium Antitrust Litig.*,
   61 F.4th 242 (2d Cir. 2023) ...................................................................18, 19

*Plavin v. Grp. Health Inc.*,
   35 N.Y.3d 1 (2020) ...............................................................................34, 35

*Poms v. Dominion Diamond Corp.*,
   No. 655733/2017, 2019 WL 2106090 (N.Y. Sup. Ct. May 15, 2019) ........................10, 11

*Ramiro Aviles v. S & P Global, Inc.*,
   380 F. Supp. 3d 221 (S.D.N.Y. 2019)..........................................................30, 31

*Reich v. Lopez*,
   38 F. Supp. 3d 436 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017) .......................7, 13

*Sandoval v. Abaco Club on Winding Bay*,
   507 F. Supp. 2d 312 (S.D.N.Y. 2007)...............................................................7

*Schwartzco Enters. LLC v. TMH Mgmt., LLC*,
   60 F. Supp. 3d 331 (E.D.N.Y. 2014) .................................................................6

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   650 B.R. 445 (Bankr. S.D.N.Y. 2023)................................................................7

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*,
   374 F.3d 158 (2d Cir. 2004)........................................................................37

*Stutman v. Chem. Bank*,
   95 N.Y.2d 24 (2000) .............................................................................34, 35

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
   916 F.3d 143 (2d Cir. 2019)........................................................................21

*U.S. Commodity Futures Trading Com'n v. Parnon Energy Inc.*,
   875 F. Supp. 2d 233 (S.D.N.Y. 2012)................................................................30

*United Bank of Kuwait, PLC v. James M. Bridges, Ltd.*,
   766 F. Supp. 113 (S.D.N.Y. 1991)...................................................................17

*In re Wachovia Equity Secs. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011)................................................................29

*Waltree Ltd. v. Ing Furman Selz LLC*,
   97 F. Supp. 2d 464 (S.D.N.Y. 2000)................................................................24

*White v. Davidson*,
   150 A.D.3d 610 (1st Dep't 2017) ...................................................................26

*Wilson & Wilson Holdings LLC v. DTH, LLC*,
       673 F. Supp. 3d 409 (S.D.N.Y. 2023)................................................................5, 23

*Ziboukh v. Whaleco, Inc.*,
       795 F. Supp. 3d 349 (E.D.N.Y. 2025) ..............................................................5, 23

**Statutes**

General Business Law §§ 349 and 350...........................................................3, 34, 35

CPLR § 302.......................................................................................................... *passim*

Federal Rule of Civil Procedure 8 ...........................................................................6, 24

Federal Rule of Civil Procedure 9 ........................................................................5, 6, 30

Federal Rule of Civil Procedure 12 .....................................................................2, 4, 5, 24

## I.    INTRODUCTION

This case is about Defendants' deliberate scheme to defraud.  Defendants never intended to be genuine partners in the Artificial Superintelligence Alliance (the "Alliance").  Their true objective from the outset was to exploit the Alliance.  Bruce Pon and Trent McConaghy, using Ocean, OceanDAO, and Ocean Expeditions as instruments of their scheme, sought to enter the Alliance to gain access to its merged token network, as the liquidity of Ocean tokens, by themselves, had become too limited.  Once Defendants gained access to the larger token network, they planned to, and did, convert and ultimately "dump" hundreds of millions of dollars' worth of $OCEAN Community Tokens despite repeatedly and publicly assuring the token holder community that those tokens were irrevocably designated for the community's benefit.

To execute this scheme, Defendants needed approval of Fetch and Singularity token holders, who voted on whether to create the Alliance and merge the Fetch, Singularity, and Ocean tokens.  Defendants retained a New York consulting firm to coordinate public relations surrounding the Alliance and the solicitation of votes for the merger.  Defendants executed a coordinated marketing and solicitation strategy, which involved using the New York consulting firm to conduct media training, draft the ASI Press Release, prepare microsite content and FAQs to promote the Alliance and solicit token holder approval, and direct a New York-based reporter to write a Bloomberg article.  Bruce Pon and Trent McConaghy coordinated with the firm and Fetch's New York representative for the purpose of promoting the token merger and the Alliance, and were closely involved in drafting, editing, and finalizing the details of the ASI Press Release. Without the coordinated and sustained marketing effort emanating out of New York, Defendants never would have secured the votes from the plaintiff class needed to join the Alliance.

The misrepresentations Defendants made to gain entry were not mere "optimistic" forward-looking statements.  Defendants misrepresented that they operated a decentralized autonomous

1

organization, that 700 million $OCEAN Community Tokens would remain designated for Alliance community incentives, and that the granting of Community Tokens was fully decentralized and would occur over decades.  Defendants knew these representations were false when made.

Defendants' Motion to Dismiss (the "Motion" or "MTD") argues that personal jurisdiction does not exist over them because, *inter alia*, they never stepped foot in New York, and "globally accessible passive websites and blog posts" cannot constitute purposeful availment.  (MTD at 2). But this argument is without merit.  The Class Action Complaint ("CAC") alleges a coordinated scheme directed toward New York: Defendants negotiated with New York-based Fetch representatives; retained New York lawyers to structure the Alliance and token merger; engaged a New York consulting firm to shape the token merger solicitation campaign; and directed public communications that they expected New York token holders to read and rely on when approving the token merger and acquiring and/or holding tokens.  These are not random or isolated contacts— they are suit-related contacts that satisfy CPLR §§ 302(a)(1) and 302(a)(3).  While many of the representations were made on blog posts or websites that were accessible on the internet, they were designed to reach Fetch and Singularity token holders, including those in New York.  Defendants sold the Plaintiffs on the idea that the Alliance would combine the three tokens and their respective communities and manifest dramatic synergies needed to propel the decentralized AI ecosystem ahead of its centralized competition.  In reality, Defendants never intended to do this.

The Motion's arguments under Rule 12(b)(6) fare no better.  The CAC alleges, in detail, the scheme that Defendants executed to fraudulently enter the Alliance in order to convert $OCEAN Community Tokens to $FET tokens, to the detriment of the Plaintiff class, and clearly alleges numerous misrepresentations of material existing fact—not, as Defendants claim, true statements or mere expressions of hope.  For instance, after the Alliance was announced but before

2

Singularity and Fetch token holders voted to approve it, Bruce Pon, Trent McConaghy, and Ocean Protocol drafted and disseminated the Vision Paper (with the help of the New York consulting firm), which assured token holders that the merger would create a new entity that was far greater than the sum of its parts.  Defendants assured the token holder plaintiffs the $OCEAN Community Tokens were under the control of OceanDAO, an allegedly decentralized autonomous organization, and could not be used for any purpose besides community incentive programs.  These were concrete misrepresentations of fact, and not merely optimistic statements about the future. The very fact that Defendants were able to transfer and dump the $OCEAN Community Tokens is proof that OceanDAO was never a decentralized autonomous organization to begin with.

The remaining counts from the CAC likewise survive dismissal.  The civil conspiracy count is well-pled, with the CAC alleging a clear agreement and concerted action among all Defendants—including Pon and McConaghy using Ocean to disseminate materials to promote the Alliance and solicit votes, creating Ocean Expeditions in the Cayman Islands to receive the 661 million $OCEAN Community Tokens that were (allegedly) held by an entity called OceanDAO, and the subsequent sale of the converted $FET tokens into the market.  Plaintiffs' claims under GBL §§ 349 and 350 are equally viable, as Defendants' extensive and coordinated public campaign to solicit token holders to vote for the merger is precisely the type of broad, consumer-oriented conduct those statutes are designed to reach.  The breach of contract and implied covenant claims flow directly from Defendants' numerous public statements that it was making a "covenant" with the token holder community, and through which Defendants induced Plaintiffs to approve the merger, only to secretly transfer hundreds of millions of $OCEAN Community Tokens to Ocean Expeditions, convert and liquidate them, and exit the Alliance at the expense of $FET holders. Finally, the promissory estoppel claim survives because Defendants made specific, material

3

promises regarding the status of the 700 million $OCEAN Community Tokens, upon which Plaintiffs relied in approving the merger, only for Defendants to do precisely the opposite. For all of the reasons described herein, Defendants' Motion to Dismiss should be denied in its entirety.

## II.     STANDARD OF REVIEW

### A.     Rule 12(b)(2)—Motion to Dismiss for Lack of Personal Jurisdiction

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff "must make a prima facie showing that the Court has personal jurisdiction over the defendant." *Kamal v. Pressler, Felt & Warshaw, LLP*, No. 23-CV-10487 (MKV), 2025 WL 919505, at *3 (S.D.N.Y. Mar. 25, 2025). "To make a prima facie showing of personal jurisdiction, a plaintiff 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *Id.* (quoting *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 85 (2d Cir. 2013)). Because Rule "12(b)(2) motions are 'inherently . . . matter[s] requiring the resolution of factual issues outside of the pleadings,' courts may" consider materials beyond the complaint, including affidavits and other evidentiary submissions. *Camacho v. Northeastern Univ.*, No. 18 Civ. 10693 (ER), 2019 WL 5190688, at *2 (S.D.N.Y. Oct. 15, 2019) (citation omitted). The Court must construe the pleadings and affidavits in the light most favorable to Plaintiffs and resolve all doubts in their favor, "notwithstanding any controverting presentation by the moving party," until such time as a "full-blown evidentiary hearing on the motion" is held, or at trial. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). Prior to any jurisdictional discovery, "Plaintiffs may rely entirely on allegations of fact, and ***they will prevail even if the moving party makes contrary allegations which controvert their prima facie case***." *Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 70 (E.D.N.Y. 2006) (emphasis added) (citation omitted). Thus, it is only after jurisdictional discovery has been conducted that plaintiff's *prima facie* showing must be factually supported.

4

Even assuming, *arguendo*, Plaintiffs have not met their burden, they have made a "sufficient start" towards demonstrating that personal jurisdiction exists over the Defendants. *Wilson & Wilson Holdings LLC v. DTH, LLC*, 673 F. Supp. 3d 409, 413 (S.D.N.Y. 2023). As such, jurisdictional discovery would be appropriate, as "[a] plaintiff should be provided with 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction' through jurisdictional discovery." *Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) (citation omitted). Importantly, "[t]he bar for granting 'jurisdictional discovery' is 'low,'" and "the Second Circuit has encouraged district courts to 'give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction' where necessary." *Ziboukh v. Whaleco, Inc.*, 795 F. Supp. 3d 349, 386 (E.D.N.Y. 2025) (citations omitted).

**B.      Rule 12(b)(6)—Motion to Dismiss for Failure to State a Claim**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (citation omitted). Where, as here, a plaintiff alleges fraud, Rule 9(b) imposes a heightened pleading standard, requiring the plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This is satisfied where the plaintiff "(1) specif[ies] the statements that the plaintiff contends were fraudulent, (2) identif[ies] the speaker, (3) state[s] where and when the statements were made, and (4) explain[s] why the statements were fraudulent." *First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014) (citation omitted). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Of course, Rule

9(b) does not displace Rule 8(a); rather, the Court must 'balance[ ] the requirements of Rule 9(b) and their overall purposes with the requirements of notice pleading under Rule 8(a).'" *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 344–45 (E.D.N.Y. 2014) (citation omitted).

**ARGUMENT**

### III.   PLAINTIFFS HAVE MADE A PRIMA FACIE SHOWING OF PERSONAL JURISDICTION OVER ALL DEFENDANTS

The CAC alleges a coordinated scheme directed towards New York: Defendants (i) negotiated with New York-based Fetch representatives (CAC ¶¶ 61–63, 67–68, 75–77); (ii) retained New York lawyers to structure the Alliance and token merger—an essential step in furtherance of the scheme (*id.* ¶¶ 63, 70–77); (iii) engaged a New York consulting firm to shape the token merger solicitation campaign (*id.* ¶¶ 65, 78–91); and (iv) directed public communications they expected New York token holders to read and rely on when approving the token merger and acquiring and/or holding tokens *(id.* ¶¶ 83–91, 94–109, 120–23). Defendants used that campaign to gain access to greater liquidity (*id.* ¶ 137), convert approximately 661,218,319 $OCEAN Community Tokens into about 286,456,967 $FET tokens (*id.* ¶ 142), and then sell approximately 263,000,000 $FET tokens on the open market, to Plaintiffs' detriment (*id.* ¶¶ 145–47, 159–70).

These are not random or isolated events. They are suit-related contacts directed to and occurring in New York that satisfy CPLR §§ 302(a)(1) and 302(a)(3).

#### A.   Defendants Transacted Business in New York Under CPLR § 302(a)(1)

New York's long-arm statute authorizes "jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006). "[A] non-domiciliary 'transacts business' under CPLR 302(a)(1) when he purposefully avails himself of the privilege of conducting activities within New York, thus

6

invoking the benefits and protections of its laws." *Sandoval v. Abaco Club on Winding Bay*, 507 F. Supp. 2d 312, 316 (S.D.N.Y. 2007) (citation omitted).  Plaintiffs' claims "arise[ ] out of" those transactions where "there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York."  *Reich v. Lopez*, 38 F. Supp. 3d 436, 457 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017) (citation omitted).

CPLR § 302(a)(1) is a "single act statute," such that "proof of one transaction in New York is sufficient to invoke jurisdiction, ***even though the defendant never enters New York***, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Deutsche Bank*, 7 N.Y.3d at 71 (citation omitted) (emphasis added).  Due to the ease of transacting business remotely, "physical presence in the forum is not a prerequisite to jurisdiction" and New York courts routinely exercise personal jurisdiction over foreign defendants whose purposeful conduct is directed to this State.  *See, e.g.*, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 650 B.R. 445, 462 (Bankr. S.D.N.Y. 2023) (finding a prima facie showing of jurisdiction where "Defendant intentionally tossed a seed from abroad to take root . . . in the United States and reap the benefits therefrom" (internal quotations and citation omitted)); *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 338–40 (2012) (holding that a Lebanese bank's repeated, purposeful use of a New York-based correspondent account to route wire transfers on behalf of its client constituted transacting business under CPLR 302(a)(1)).  "So long as a party avails itself of the benefits of the forum, has sufficient minimum contacts with it, and should reasonably expect to defend its actions there, due process is not offended if that party is subjected to jurisdiction even if not 'present' in that State."  *Deutsche Bank*, 7 N.Y.3d at 71.

The CAC plausibly alleges that Defendants purposefully transacted business in New York and that Plaintiffs' claims arise from those transactions.

       *1.     Defendants' Retention and Use of New York Professionals Was Integral to the Alleged Scheme*

Defendants trivialize their New York contacts as the incidental retention of New York professionals.[1] *See* MTD at 9–12. But those contacts were not random or fortuitous; they instead were purposefully directed to New York as part of Defendants' scheme to enter the Alliance and dump the $OCEAN Community Tokens for their personal gain. CAC ¶¶ 23, 66, 70–94. Specifically, beginning in late 2023 or early 2024, Defendants, Singularity, and Fetch extensively negotiated the formation of the Alliance. *Id.* ¶ 61. Fetch representatives were located in New York, and Defendants knowingly "exchanged numerous emails and participated in conference calls and video conference with Fetch's representatives in New York." *Id.* ¶¶ 62; *see also* ¶¶ 67, 75. Defendants, together with Fetch and Singularity, retained a New York law firm to advise on the Alliance's formation, structure, governance, and operation, as well as the legal implications of the token merger; and that firm drafted an agreement governing the token merger. *Id.* ¶¶ 63, 70–77. The New York law firm's work relates to the core of Plaintiffs' claims, which arise from Defendants' misrepresentations and fraud surrounding the Alliance and token merger. Further, "Defendants ultimately paid one-third of the New York law firm's fees associated with the advice they received regarding the formation of the alliance; the token merger; the tax implications of the token merger; and the governing document of the Alliance (the Constitution)." *Id.* ¶ 77.

While Defendants suggest Fetch alone retained the New York firms and that Plaintiffs are improperly trying to impute Fetch's contacts to Defendants, it is notable that in his sworn affidavit,

---

[1] Defendants' assertion that the initial $OCEAN token distribution in 2019 somehow cuts against personal jurisdiction over Ocean Protocol is a red herring. *See* MTD at 9. Plaintiffs do not assert claims based on purchasing $OCEAN in that initial offering. Instead, the CAC alleges claims arising from the formation of the Alliance in 2024, Defendants' campaign to solicit support and approval for the token merger, the token merger itself, and Ocean's later liquidation of the $OCEAN Community Tokens. The exclusion of U.S. residents from a prior 2019 offering says nothing about the New York-directed solicitation campaign that forms the basis of Plaintiffs' claims and is therefore irrelevant.

Bruce Pon merely states "[n]either Ocean Foundation, nor I *directly* paid the New York consulting firm," and "*I* did not receive any invoices from the New York law firm and did not *directly* pay the New York law firm." *See* Declaration of Bruce Pon in Support of Defendants' Motion to Dismiss, ¶¶ 19–20. Mr. Pon thus subtly acknowledges that Ocean Foundation—at his direction—did pay one third of the New York consulting firm's fees and one third of the New York law firm's fees, albeit indirectly. Mr. Pon cannot evade jurisdiction by hiding behind his controlled entity, because as the CAC alleges, it was Pon who directly interfaced with the New York law firm, New York consulting firm, and the Fetch representative in New York.

Next, Defendants engaged a New York consulting firm "to coordinate public relations surrounding the announcement of the Alliance and the solicitation of votes for the token merger." *Id.* ¶ 78. The firm helped draft and disseminate the very communications containing Defendants' fraudulent statements. *Id.* ¶¶ 83, 91, 107–08, 181, 185–86. Specifically, the firm assisted Defendants, Singularity, and Fetch in drafting the Vision Paper, which was "was designed to solicit token holders in this district to approve the token merger, including Plaintiff Seth Ian." *Id.* ¶¶ 87; *see also id.* ¶¶ 107–08.[2] It also "drafted a press release to announce the creation of the Alliance and the proposed token merger," *id.* ¶ 83, including Bruce Pon's statement that "'the unified \$ASI token' that would result from the Platforms' token merger 'is the glue to orchestrate all actors with common incentives.'" *Id.* ¶ 86. This press release is another source of the alleged false representations to the Singularity and Fetch communities made by Defendants. *Id.* ¶¶ 181, 185–86. Next, the firm "drafted microsite content and Frequently Asked Questions (FAQs) for the Defendants to promote the Alliance, the token merger, and to solicit token holders to vote to

---

[2] Defendants made numerous fraudulent representations in the Vision Paper, as detailed further below. *See infra* § II.B.

approve the merger in New York and elsewhere" and "directed a New York-based reporter to write a Bloomberg article about the Alliance and token merger." *Id.* ¶¶ 88, 91.  And Defendants were closely involved in drafting, editing, and finalizing the details of the ASI Press Release" in collaboration with the New York consulting firm, including by "exchang[ing] numerous emails and participat[ing] in conference calls or video conferences with the consulting firm and Fetch's representative, both of whom were in New York, for the purpose of promoting the token merger and the Alliance." *Id.* ¶¶ 82–83.  Further, the firm's engagement was governed by New York law, and any disputes arising therefrom required arbitration in New York County.  *Id.* ¶ 80.

In short, the retention of the New York law firm and consulting firm were directly related to, and a central component of, Defendants' scheme to enter the Alliance and liquidate the $OCEAN Community Tokens.  *See, e.g.*, CAC ¶¶ 66, 78 ("Around the same time that Defendants, Fetch, and Singularity secured the services of the New York law firm, they also engaged a respected New York marketing and consulting firm to coordinate public relations surrounding the announcement of the Alliance and the solicitation of votes for the token merger.").  Without the coordinated and sustained marketing effort emanating out of New York, Defendants never would have secured the votes needed to join the Alliance—a crucial initial step in their scheme.

Defendants' attempt to minimize their contacts with New York relies on inapposite situations where defendants' contacts with the forum were unrelated to the operative wrongdoing. For example, in *Poms v. Dominion Diamond Corp.*, a stockholder sued a Canadian corporation in New York state court over incomplete and misleading disclosures in an Information Circular related to a proposed acquisition.  No. 655733/2017, 2019 WL 2106090, at *2–3 (N.Y. Sup. Ct. May 15, 2019) (MTD at 10).  While the plaintiff alleged defendants engaged attorneys from New York in connection with the deal, it did not allege that Dominion's retention of those attorneys

was "substantially related to his claim" that the "disclosures concerning the proposed acquisition in Canada of a Canadian company by an affiliate of a Montana company were inadequate and/or misleading." *Id.* at *4.  On those "tangential" allegations, the court held consulting New York attorneys about a Canadian transaction, "*without more*," failed to "supply the required link between Defendants New York presence and the subject matter of the litigation." *Id.* (emphasis added).

At the other end of the spectrum is *Fischbarg v. Doucet*, 9 N.Y.3d 375 (2007), which provides the more apt analogue to this case.  There, the court held that personal jurisdiction over non-domiciliary defendants was proper because of the "defendants' purposeful attempt to establish an attorney-client relationship here and their direct participation in that relationship via calls, faxes and e-mails that they projected into this state over many months." *Id.* at 380.  The court considered physical presence "immaterial" because the defendants "projected themselves into [New York's] legal services market" by retaining the plaintiff. *Id.* at 381–82.

The continuing business relationship described in *Fischbarg*—not the attenuated allegations in *Poms*—tracks the facts alleged here, as "the epicenter of the negotiations and solicitations relating to the Alliance and the token merger was New York." CAC ¶ 66. Importantly, Defendants' misrepresentations were made out of New York when structuring the token merger and soliciting token holder approval via the drafting and dissemination of the Alliance Constitution, Vision Paper, and ASI Press Release—the very heart of this case. *Id.* ¶¶ 61–68, 75–77, 82–91, 107–09.  Critically, those materials were prepared with the assistance of New York-based counsel and consultants, whose work was not merely tangential but inseparable from the alleged misrepresentations and central to the conspiracy alleged by Plaintiffs. *See id.*

The CAC alleges the Defendants, together with Fetch and Singularity, retained the New York-based consulting firm "to coordinate public relations surrounding the announcement of the

11

Alliance and the solicitation of votes for the token merger," with full knowledge that the firm was located in New York. *Id.* ¶¶ 78–79. Defendants used the consulting firm to actively develop the very solicitation campaign through which Defendants sought the votes necessary to consummate the merger. *See supra* § I.A.1. It is irrelevant whether or not Defendants directly "hired, contracted, or engaged the law firm or consulting firm named in the CAC." *See* MTD at 12. Those New York professionals performed work on Defendants' behalf and at their direction in connection with the formation of the Alliance, structure of the token merger, and the public solicitation campaign at the core of Plaintiffs' claims, and that Defendants paid one-third of the law firm's fees. CAC ¶ 77. Defendants engaged in substantial communications with both firms concerning the structuring of the token merger, the Alliance Constitution, and the press campaign soliciting token holder approval of the merger. *Id.* ¶¶ 70–77, 82, 90.

Defendants have no defense by arguing they participated from outside New York. New York courts have repeatedly held that purposeful business activity may occur through electronic and telephonic communications where a non-domiciliary defendant projects itself into New York business dealings. For example, in *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 797 N.Y.S.2d 439 (1st Dep't 2005), *aff'd*, 7 N.Y.3d 65, 850 N.E.2d 1140 (2006), the court held that personal jurisdiction was proper based on the defendant investment officer's substantial communications with a Deutsche Bank director in negotiating a bond swap. *Id.* at 442. The court rejected the defendant's attempt to "evade transactional jurisdiction by simply claiming that he did not initiate the deal and that he was nowhere near New York when the deal was consummated," reasoning his communications through the Bloomberg Messaging System "allowed [him] very purposefully to negotiate a bond deal with this New York plaintiff without having actually to set foot in New York," and that he "played a crucial role in creating the substance of the transaction." *Id.* at 443.

The same reasoning applies here. Defendants' repeated emails, calls, and videoconferences with New York participants and New York professionals (*see, e.g.*, CAC ¶¶ 62, 67, 75, 82–83, 90) allowed them to purposefully "transact business" without "having actually to set foot in New York." *Deutsche Bank Sec., Inc.*, 797 N.Y.S.2d at 444. That Defendants may have never physically entered the forum is irrelevant where they allegedly "played a 'crucial role' in creating the substance of the transaction" through reliance on modern technology. *Id.*

The cases cited by Defendants in support of the proposition that "remote correspondence into New York is insufficient" are inapposite. MTD at 12–13. In *JihShyr Yih v. Taiwan Semiconductor Mfg. Co.*, No. 18-cv-3844 (VEC), 2019 WL 2578306 (S.D.N.Y. June 24, 2019), the court declined to exercise specific jurisdiction over a Taiwanese corporation based on alleged recruitment of a New York plaintiff through "five emails, two phone calls, and two Skype calls." *Id.* at *6. Those communications, however, were directed toward soliciting the plaintiff to perform work outside New York. *Id.* at *8. Similarly in *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1261 (S.D.N.Y. 1995), *aff'd*, 201 F.3d 431 (2d Cir. 1999), the court rejected jurisdiction over a foreign defendant where the bulk of the parties' dealings occurred in Taiwan, including face-to-face negotiations, contract execution, and substantial contract performance, and limited communications with the plaintiff in New York were incidental. *Id.* at 1260–63.

This case is fundamentally different. Plaintiffs do not rely on incidental communications into the forum. Rather, Defendants purposefully communicated with New York individuals and conducted the New York-centered transactions giving rise to Plaintiffs' claims. Plaintiffs therefore satisfy their burden to plausibly allege an "articulable nexus" and a "substantial relationship" between Defendants' New York transactions and their claims. *Reich v. Lopez*, 38 F. Supp. 3d 436, 457 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017).

13

2.    *Defendants Solicited New York Token Holders Through a Campaign Directed at Securing Support for the Token Merger and Alliance*

In addition to retaining New York professionals, Defendants utilized the New York professionals to further their scheme.  The CAC alleges that Defendants undertook a coordinated solicitation campaign designed to secure approval of the token merger and promote participation in the post-merger token system, and this campaign was developed in consultation with a New York public relations firm.  CAC ¶¶ 78–91, 107–09, 120–23.  Defendants seek to minimize their New York contacts by claiming their communications to the token holders were merely "passive" internet activity.  MTD at 13–14.  But because of the pseudo-anonymous nature of blockchain holdings, token holders' identities and locations cannot be obtained through conventional shareholder lists and direct communications.  As a result, communications like the Vision Paper, press releases, X posts, Telegram posts, FAQs, and microsite materials served as the functional equivalent of direct solicitation to the token holder community.  CAC ¶ 95.  Critically, these communications were made for the express purpose of reaching out to, and securing the approval of, $FET and $AGIX token holders.  *Id.* ¶¶ 83–91, 93–94, 109, 120–23.

Defendants' theory of personal jurisdiction essentially argues that a token issuer may communicate to token holders through websites, social media, and cryptocurrency exchanges available to *anyone*, and then evade jurisdiction *everywhere*.  *See, e.g.*, MTD at 13–14.  That position would produce an absurd result: any blockchain-based entity could solicit token holders through publicly accessible websites, induce them to take action based on material representations, and then disclaim jurisdiction in every forum by characterizing those communications as "passive" rather than specifically targeted.  But that is precisely how entities in the cryptocurrency space communicate with their stakeholders.  A token project does not have the names, email addresses, or phone numbers of its, or other, token holders.  Online publications, governance protocols, and

14

social media are the primary, and usually *only*, means of communicating with token holders. Defendants cannot exploit the decentralized architecture of blockchain technology as a jurisdictional shield while soliciting New York investors and advancing their scheme.

Defendants compare this case with those involving attempts to assert jurisdiction over defendants based on nothing more than the mere accessibility of a website in New York. MTD at 13–14. Defendants did much more than simply maintain a passive web presence. In reality, Defendants participated in a coordinated solicitation campaign tied to a discrete transaction and directed at a known investor community. This "web presence" was designed, built and maintained in New York to actively solicit votes in favor of Defendants' admission into the Alliance. CAC ¶¶ 78–91, 107–09. For example, Seth Ian, a New York resident, read the Vision Paper as well as blog posts and X posts published by Defendants regarding the Alliance and token merger before voting in favor of the merger, in reliance on the accuracy and validity of those representations. CAC ¶ 122. And Greg Graves, who is also domiciled in New York, held approximately 30,000 $FET tokens and voted in favor of the Alliance and token merger. *Id.* ¶ 13.

### B.    Jurisdiction Also Exists Under CPLR § 302(a)(3)(ii)

Plaintiffs also adequately plead jurisdiction under CPLR § 302(a)(3)(ii), which applies where Defendants (i) committed tortious acts outside New York that caused injury in New York, (ii) reasonably should have expected their conduct to have consequences in New York, and (iii) derive substantial revenue from interstate or international commerce. *See also LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214–16 (2000). Plaintiffs allege facts satisfying each element.

#### 1.    *Defendants Committed Tortious Acts Causing Injury In New York*

Defendants knowingly misrepresented numerous facts to Plaintiffs in the Vision Paper, press release, and various blog posts intended "to induce Plaintiffs and other Alliance community

members to approve the token merger and to acquire, hold, and convert ASI tokens." CAC ¶¶ 181, 187. These acts are described in substantial detail herein. *See supra* § I.A; *infra* § II.B.

Plaintiffs allege injury in New York because, inter alia, New York resident Seth Ian voted in favor of the token merger and held tokens in reliance on Defendants' misrepresentations. *Id.* ¶¶ 12–13, 122, 134–35. Plaintiffs also allege that Defendants converted 661,218,319 $OCEAN Community Tokens into approximately 286,456,967 $FET tokens and sold approximately 263 million $FET tokens on the open market, thereby depressing the value of tokens held by Plaintiffs and the class. *Id.* ¶¶ 141–47, 157–70. Plaintiffs have thus adequately alleged that Defendants committed tortious acts causing injury in New York.

> 2.   *Defendants Reasonably Should Have Expected Their Conduct To Have Consequences In New York*

The foreseeability requirement is also satisfied. Defendants knew Fetch representatives were in New York while negotiating the terms of the Alliance (*id.* ¶¶ 62, 67–68), engaged New York legal and consulting professionals to help draft the Alliance documents and solicit public approval for the token merger (*id.* ¶¶ 78–91), agreed to a New York-governed consulting engagement with a forum selection clause designating arbitration in New York (*id.* ¶ 80), and directed communications they expected New York token holders to receive and act upon (*id.* ¶¶ 78, 88–91, 93–94, 122–23, 187–88, 191–94). For Ocean and Defendants, consequences in New York were eminently foreseeable. *See, e.g.*, *id.* ¶ 66 ("Defendants' extensive contacts with New York demonstrate that the epicenter of the negotiations and solicitations relating to the Alliance and the token merger was New York" where "[e]ach of the actions taken by Defendants was part of their scheme to induce token holders to approve the formation of the Alliance and to vote in favor of the token merger."); ¶¶ 93–94 ("Defendants took significant, purposeful steps to solicit the affirmative vote of $FET and $AGIX token holders, including holders, like Plaintiffs, that are

16

located in this district" by "publish[ing] solicitations and other communications on the Internet in order to reach token holders and persuade them to support the merger.").

       3.     *Defendants Derive Substantial Revenue From Interstate Or International Commerce*

The interstate-or-international-commerce element is easily met here. "The requirement that the defendant derive substantial revenue from interstate commerce was meant to exclude businesses whose operations are local in nature." *United Bank of Kuwait, PLC v. James M. Bridges, Ltd.*, 766 F. Supp. 113, 117–18 (S.D.N.Y. 1991); *accord Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997) (declining to exercise jurisdiction over a Missouri jazz club where the alleged interstate revenue consisted of hiring nationally-known bands and serving out-of-state domiciliaries (i.e. students attending the University of Missouri)). Clearly, Defendants' business operations are not local in nature. The CAC alleges that Ocean is a global enterprise (CAC ¶ 16), was part of a multinational Alliance (*id.* ¶¶ 43–50, 110), entered into a token merger involving billions of dollars in combined value (*id.* ¶ 97), and liquidated hundreds of millions of tokens on the open market using entities in Singapore and the Cayman Islands (*id.* ¶¶ 139, 145, 155). At the pleading stage, those allegations suffice to show that Defendants derive substantial revenue from interstate or international commerce.

## C.    Personal Jurisdiction Is Proper Over the Individual Defendants and DAO Defendants

Defendants argue that jurisdiction cannot rest on group pleading and must be based on each individual's own forum contacts. The CAC satisfies that standard.

First, the Individual Defendants were principal decisionmakers and public representatives of Ocean, participated in Alliance negotiations with New York-based participants, and helped draft and disseminate the solicitations that induced the merger vote. As to Bruce Pon and Trent McConaghy, they negotiated with Fetch's New York representatives and participated in calls and

17

videoconferences involving New York participants (*id.* ¶¶ 62, 67, 68, 75, 82), took part in media training and strategy sessions involving the New York consulting firm (*id.* ¶¶ 81, 90), helped draft and disseminate the Vision Paper and related public communications promoting the Alliance (*id.* ¶¶ 83, 94, 96–109), and made or amplified statements concerning the token merger. *See id.* As to Christina Pon, she co-founded Ocean with Bruce Pon and McConaghy, was viewed by the market as an alter ego of Ocean, dominated and controlled Ocean, and was part of the "Ocean Protocol Team" whose posts required approval by one of the Individual Defendants. *Id.* ¶¶ 20, 52, 104. If Defendants dispute the extent of her role, that presents a factual issue for discovery, not a basis for dismissal for lack of jurisdiction on the pleadings. "The Court cannot resolve factual disputes on a motion to dismiss." *Kiseleva v. Greenspan*, 755 F. Supp. 3d 367, 381 (S.D.N.Y. 2024).

Second, the CAC alleges conspiracy jurisdiction in the alternative. Conspiracy jurisdiction rests on "the time-honored notion that the acts of a conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 269–70 (2d Cir. 2023) (internal citations omitted). "Under that theory, one conspirator's minimum contacts allow for personal jurisdiction over a co-conspirator, even when the co-conspirator lacks such contacts itself." *Id.* (citations and internal quotation omitted). To do so, a plaintiff must plausibly allege that: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state.'" *Id.* (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018)).

The Second Circuit emphasized that the third prong—whether "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with [the forum]"—is "not a difficult requirement to meet," because "an overt act is any act performed by any conspirator for the purpose

18

of accomplishing the objectives of the conspiracy." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 271 (2d Cir. 2023) (citation omitted).  For example, in *Schwab v. Bank of Am. Corp.* ("*Schwab II*"), the court held that plaintiffs satisfied this requirement by alleging that executives in New York issued directives, including by email, that subordinates "submit low LIBOR contributions" in order to manipulate LIBOR.  22 F.4th 103, 123 (2d Cir. 2021).  Those allegations constituted overt acts in the United States in furtherance of the conspiracy and were sufficient to support personal jurisdiction over all defendants, including those who did not determine or transmit LIBOR submissions from the United States.  *Id.* at 123.  Because the district court had not held an evidentiary hearing, the Second Circuit further held that it was improper to credit the moving defendants' declarations over the plaintiff's plausible factual allegations.  *Id.* at 124.

Here, Plaintiffs allege several "overt acts" in furtherance of the conspiracy, including, those acts described in the preceding paragraphs.  Defendants performed these overt acts to induce token holders to vote in favor of the token merger as part of the Defendants' common scheme to enrich themselves at Plaintiffs' expense, and these acts should be imputed to all Defendants.

Defendants also argue that jurisdiction over the Individual Defendants cannot be predicated on jurisdiction over the corporation, but that oversimplifies the law.  In *Giuliano v. Barch*, No. 16 CV 0859 (NSR), 2017 WL 1234042, at *6 (S.D.N.Y. Mar. 31, 2017), the court explained that corporate representatives "may be subject to specific personal jurisdiction (*but not general jurisdiction*) based on his actions in his corporate capacity." *Id.* (citation omitted).  In other words, the exercise of jurisdiction is not "automatic," but must be satisfied under CPLR 302.  And as set forth in Section I.A above, there is specific jurisdiction over the Individual Defendants here.

Nor may the Individual Defendants invoke a fiduciary-shield theory.  New York does not recognize a doctrine that insulates corporate officers from jurisdiction for forum-directed acts

19

taken in a corporate capacity.  *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 470–72 (1988) ("[I]t is neither necessary nor desirable to adopt the fiduciary shield doctrine in New York.").

Jurisdiction is also proper over OceanDAO and Ocean Expeditions.  Defendants argue that there are no allegations these entities transacted business within New York, were parties to the law firm or consulting agreements, and were not alleged to have participated in the strategy and communications surrounding the promotion of the Alliance and token merger.  MTD at 14.  But the CAC alleges OceanDAO (to the extent it was even a legal entity with its own corporate existence) was created by Ocean, represented as a decentralized grants DAO, and later converted into Ocean Expeditions, with OceanDAO assets—including hundreds of millions of $OCEAN Community Tokens—transferred to Ocean Expeditions.  *Id.* ¶¶ 17–19, 139–47.  Plaintiffs further allege that Ocean Expeditions became the vehicle through which Defendants gained control over, converted, and liquidated the $OCEAN Community Tokens for their own personal enrichment, demonstrating that OceanDAO "was never actually a decentralized, autonomous organization—it was under the complete control of Defendants."  *Id.* ¶ 140.  In that sense, OceanDAO and Ocean Expeditions are not independent bystanders, but rather the alter egos of the Individual Defendants and indeed the instrumentalities through which they executed the final step of their scheme.  *Id.* ¶¶ 139–45; *see also infra* § IV.G.  These allegations directly tie the DAO Defendants to the tortious acts causing injury, the New York-directed solicitation, and the wider conspiracy.

At a minimum, these allegations establish a prima facie basis for jurisdiction over the Individual Defendants and warrant discovery into the extent of their involvement in the New York-centered activities described in the CAC.

### D.    Exercising Jurisdiction Comports With Due Process

The exercise of jurisdiction also satisfies due process.  "To comport with due process, a forum state may exercise jurisdiction over an out-of-state corporate defendant only if the defendant

20

has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 149 (2d Cir. 2019) (citations omitted).  As Defendants acknowledge, in New York, the long-arm and due-process inquiries generally "yield the same result," and "the elements of the 'transacts business' prong of § 302(a)(1) and the elements satisfying minimum contacts are substantially the same under New York law."  MTD at 17.  As set forth in Section I.A, *supra*, this Court may constitutionally exercise jurisdiction over all Defendants named here.

Defendants, though, again invoke cases concerning passive internet activity to argue that Plaintiffs have not shown purposeful availment of the New York forum.  But each of those cases turned on the absence of suit-related conduct specifically directed to the forum.  For example, Defendants cite *Basic v. BProtocol Foundation*, where the court found that "online statements 'available to nearly the entire world' and decentralized token availability did not establish minimum contacts."  MTD at 18 (quoting *Basic v. BProtocol Found.,* No. A-23-CV-533-RP, 2024 WL 4113751, at *7 (W.D. Tex. July 31, 2024), *R&R adopted*, No. 1:23-CV-533-RP, 2024 WL 4113024 (W.D. Tex. Sept. 6, 2024), *vacated in part,* No. 1:23-CV-533-RP, 2024 WL 6077793 (W.D. Tex. Dec. 16, 2024)).  But the allegations in *Basic* were materially more limited than the contacts present here, however, where Defendants specifically contracted with a New York law firm and marketing firm, and engaged in various communications by email, telephone, and videoconference with those professionals and with Fetch representatives located in New York, to structure the Alliance and token merger and related solicitation campaign.  CAC ¶¶ 62–83.

The same distinction overcomes Defendants' reliance on *In re EHang Holdings Ltd. Securities Litigation*, where the court held that personal Twitter and LinkedIn posts mentioning U.S. activity were insufficient because the posts were not themselves the challenged misstatements

21

and there was no adequate showing that the defendant had a role in making or preparing the allegedly false statements.  646 F. Supp. 3d 443, 458 (S.D.N.Y. 2022).  Here, by contrast, Defendants made the challenged material misrepresentations while negotiating with Fetch representatives in New York and while drafting the Alliance Constitution, Vision Paper and ASI Press Release with the assistance of New York professionals, and that those fraudulent statements were aimed at soliciting token holders in New York.  CAC ¶¶ 61–68, 70–91, 107–09, 180–88.

Defendants' remaining citations are more of the same—selective quotations from cases where the plaintiffs failed to plausibly allege the defendants directed their marketing activity to the forum state.  *See* MTD at 18 n.14.  But here, Defendants engaged New York lawyers and consultants, negotiated with New York-based participants, entered a New York-governed consulting arrangement, and directed communications to induce New York token holders to vote for the merger.  *See supra* § I.A.  In light of these substantial, purposeful contacts, maintaining this suit in New York does not offend traditional notions of fair play and substantial justice.

### E.    Defendants' Declarations Do Not Defeat Jurisdiction

Defendants attempt to defeat jurisdiction by submitting declarations asserting they did not hire, contract with, manage, or pay the New York law firm or consulting firm, and any contact with counsel primarily occurred through Singapore counsel.  MTD at 12; B. Pon Decl. ¶¶ 14–18; McConaghy Decl. ¶¶ 7–9.[3]    But those assertions directly contradict the CAC's well-pled allegations.  *See* CAC ¶¶ 63, 65, 70–83.  Prior to jurisdictional discovery or an evidentiary hearing, the Court does not resolve those factual disputes in Defendants' favor.  *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 84–86 (2d Cir. 2013).

---

[3] As noted above (*see* B. Pon Decl. ¶¶ 14–18), Mr. Pon's declaration states only that neither Mr. Pon nor Ocean Protocol Foundation *directly* paid the New York consulting firm, and that Mr. Pon did not directly pay the New York law firm, leaving unsaid that Ocean Protocol paid both firms, though the New York consulting firm was only paid indirectly.

Even if credited, Defendants' declarations cannot defeat jurisdiction. Bruce Pon concedes that he and Ocean Foundation had at least some contact with the New York law firm and consulting firm referenced in the CAC. B. Pon Decl. ¶ 19 ("[N]either Ocean Foundation, nor I ***directly*** paid the New York consulting firm."), *id.* ¶ 20 (stating he "did not ***directly*** pay the New York law firm"); (emphases added). His assertion that he "primarily" communicated with counsel based in Singapore does not negate those New York contacts—it merely raises a factual dispute about the *extent* of Defendants' New York dealings. *See id.* ¶ 17. Moreover, Pon's claim that "Fetch was the single point of contact for the consulting firm" is belied by the CAC's well-pled allegations that "Bruce Pon and McConaghy exchanged numerous emails and participated in conference calls or video conferences with the consulting firm and Fetch's representative, both of whom were in New York, for the purpose of promoting the token merger and the Alliance" and "were closely involved in drafting, editing, and finalizing the details of the ASI Press Release with the consulting firm." *Id.* ¶¶ 82–83. At this stage, the court "assumes the truth of the plaintiff's factual allegations for purposes of the motion" and "the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Dorchester*, 722 F.3d at 85. At this stage, Pon's partial concession only reinforces Plaintiffs' *prima facie* showing of jurisdiction.

## F.    At Minimum, Plaintiffs Are Entitled to Jurisdictional Discovery

Even if the Court is not satisfied that Plaintiffs have conclusively established jurisdiction on the present record, dismissal would still be premature where Plaintiffs have a "sufficient start" toward establishing personal jurisdiction. *Ziboukh v. Whaleco, Inc.*, 795 F. Supp. 3d 349, 386 (E.D.N.Y. 2025); *see supra* § I.A. At a minimum, Plaintiffs have plausibly alleged facts creating a "genuine issue of jurisdictional fact" that entitles them to jurisdictional discovery. *Wilson & Wilson Holdings LLC v. DTH, LLC*, 673 F. Supp. 3d 409, 413 (S.D.N.Y. 2023).

23

## IV.    THE CAC STATES VIABLE CLAIMS UNDER RULE 12(B)(6)

### A.    The CAC Does Not Impermissibly Group Plead

Defendants claim Plaintiffs "improperly engaged in impermissible group pleading," and that the CAC "lump[s] all the defendants together in each claim and provide[s] no factual basis to distinguish their conduct."  MTD § II.A.  Defendants' group pleading argument, however, is premised on a misstatement of the governing standard.  There is no absolute prohibition on collective references to multiple defendants in a complaint.  The actual and controlling standard is far more permissive: "[s]o long as it is plausible that each defendant was involved in all of the facts alleged, group pleading is permissible."  *McPherson v. Baltimore Police Dep't*, 494 F. Supp. 3d 269, 280 (D. Md. 2020).  As another judge in the Southern District of New York observed last year, "[i]n prohibiting 'group pleading,' courts acknowledge that the principal function of pleadings under the federal rules is to give the adverse parties fair notice of the claims asserted [against them] so as to enable them to answer and prepare for trial.  Thus, in accordance with the lenient standard set by Rule 8, [d]ismissal under [the rule] is usually reserved for those cases in which the complaint is so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised."  *Ortiz v. Consol. Edison Co. of New York, Inc.*, 801 F. Supp. 3d 260, 294 (S.D.N.Y. 2025) (internal quotations and citations omitted); *see also Waltree Ltd. v. Ing Furman Selz LLC,* 97 F. Supp. 2d 464, 469 (S.D.N.Y. 2000).

*New v. Faris* is instructive.  There, a defendant moved to dismiss a complaint for "impermissible group pleading," arguing the plaintiffs failed to "differentiate between the conduct allegedly committed by him and the Doe Defendants."  '749 F.Supp.3d 650, 654–55 (S.D.W. Va. 2024).  The court rejected this argument and explained that "'[g]roup pleading . . . attributes allegations to a subset of defendants rather than to a particular defendant," and confirmed that so

24

long as "it is 'plausible that each defendant was involved in all of the facts alleged,'" group pleading is permissible. *Id.* at 656–57 (quoting *McPherson v. Baltimore Police Dep't.*, 494 F. Supp. 3d 269, 280 (D. Md. 2020)). The court held that where "[t]he Complaint alleges sufficient facts to put [a defendant] on notice of the claims against him, and the allegations contained therein are not so vague and ambiguous to hinder a response," the use of group pleading "is thus not a proper basis to support dismissal." *Id.* at 657. The court observed that the defendant's "detailed briefings" in support of his motion to dismiss demonstrated the defendant was on notice of the claims and capable of defending himself against them. *Id.*

For the same reasons, the fact that certain paragraphs in the CAC allege the Defendants collectively engaged in certain acts is not a basis to dismiss the CAC. The CAC plainly alleges that Defendants Bruce Pon, Trent McConaghy, and Christina Pon controlled Ocean Protocol and Ocean Expeditions, and utilized the entities to carry out their scheme to enter the Alliance, convert the $OCEAN Community Tokens, and dump them to the detriment of $FET and $AGIX token holders. The sophistication and specificity of Defendants' brief confirms that every Defendant is on notice of the claims against them. To the extent the CAC uses the collective term "Defendants" in certain allegations, that usage is entirely appropriate because the conduct alleged—including the making of public statements about the Alliance and Community Tokens, the solicitation of votes for the token merger, and the conversion and liquidation of the Community Tokens—was carried out collectively and in concert by all Defendants in furtherance of a common scheme. Where a complaint plausibly alleges that multiple defendants acted together, collective allegations are not only permissible, but appropriate. *See Grant Industries, Inc. v. Isaacman*, 2022 WL 2358422, at *16 n.19 (D.N.J. June 30, 2022) ("In light of the allegations tying the various defendants to the conspiracy, defendants' 'group pleading' argument lacks merit.").

25

**B.    Count One—Fraud**

Defendants represented that they operated a DAO, that 700 million $OCEAN Community Tokens would remain designated for Alliance community incentives within a DAO, and that the granting of the Community Tokens was fully decentralized and would occur over decades. Defendants knew these representations were false.  Plaintiffs and other Alliance community members relied on the veracity of the representations to let Defendants into the Alliance, approve the token merger, and to acquire, hold, and convert ASI tokens.  But Defendants never intended to work for the Alliance or the token holders' benefit.  Instead, once Defendants gained entry to the Alliance, they converted the Community Tokens and absconded with tens, if not hundreds, of millions of dollars, leaving the Plaintiff class holding the bag.  Plaintiffs have more than adequately stated a claim for fraud.  Defendants' arguments to the contrary are unavailing.

*1.    The CAC Alleges Misrepresentations That Were False When Made*

Defendants contend the CAC does not allege any statements were materially false when made, [4] but rather the statements were truthful expressions of hope for the future which do not constitute actionable representations of present fact.  MTD at 21–22.  Defendants are wrong on both counts.  First, the misrepresentations were simply not true when made: *e.g.*, Defendants did not actually operate OceanDAO as a true DAO, and it was a falsehood that $OCEAN Community Tokens could only enter the market through smart contracts.  CAC ¶¶ 56–60, 181–86, 189. Defendants made many other false statements.  *See, e.g.*, *id.* ¶¶ 96–97, 100, 114, 122, 127–28, 132–34, 145.  Second, allegations of Defendants' intent at the time of the misrepresentations are allegations of existing material facts that cannot be resolved on a motion to dismiss.  *See White v.*

---

[4] Right off the bat, Defendants mischaracterize the CAC by conflating the general subject matter of a misrepresentation with the number of misrepresentations.  *See* MTD at 20–21.  The CAC alleges more than just three misrepresentations. *See* CAC ¶¶ 96–97, 100, 114, 122, 127–28, 132–34, 145.

26

*Davidson*, 150 A.D.3d 610, 611 (1st Dep't 2017) ("[I]f a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact." (citation omitted)).  And here, the CAC alleges, in detail, the scheme that Defendants executed to fraudulently enter the Alliance to convert OCEAN Community Tokens to FET tokens, to the detriment of the Plaintiff class.  Through this lens, which Defendants ignore, the CAC clearly alleges misrepresentations of existing fact; not just mere expressions of hope.

Defendants next assert that the Complaint does not identify any promise that Community Tokens would be held indefinitely in $OCEAN.  MTD at 22.  That is a red herring.  The issue is not whether the $OCEAN Community Tokens would be held indefinitely in OceanDAO, but rather the misrepresentations that the Community Tokens were not under the Defendants' control and could not be allocated by the Defendants.  Defendants promised the Community Tokens were being disbursed via smart contracts, were following a Bitcoin-like disbursement schedule, were to remain designated for community incentives after the merger, and *could not be liquidated* like treasury tokens.  CAC ¶¶ 60, 127–30, 181–85.[5]  If these statements were true, Defendants could not have transferred the $Ocean Community Tokens from OceanDAO to Ocean Expeditions,

---

[5] This is not a case involving a subjective misunderstanding of information that is not false or misleading. *Gomez-Jimenez v. New York Law School*, 103 A.D.3d 13, 18 (1st Dep't 2012) (dismissing fraud because the complained-of employment data was not actually false).  As alleged, the statements were objectively false.

Further, Defendants are simply contradicting or otherwise misrepresenting the well-pled allegations in the complaint by asserting that the "schedule for token distribution" were merely forward-looking and aspirational plans. *See Cimen v. HQ Capital Real Estate, L.P.*, 227 A.D.3d 587, 587 (1st Dep't 2024) (dismissing fraud claim premised on an investment memoranda's understatement of the expected vacancy losses); *ESBE Holdings, Inc. v. Vanquish Acquisition Partners, LLC*, 50 A.D.3d 397, 398 (1st Dep't 2008) (holding that claims based "upon defendants' projections of returns on investment … are not actionable because such projections are merely statements of prediction or expectation").  In reality, Defendants misrepresented that $OCEAN Community Tokens *were* being distributed via smart contracts and *would continue* to do so.  These statements were not about the expected future value of Community Tokens.  Rather, they were integral to Defendants' fraudulent scheme to make it appear as if the Community Tokens were fully decentralized.

converted the tokens to $FET tokens, liquidate the converted tokens on the open market, and abscond with hundreds of millions of dollars. *Id.* ¶¶ 139–47, 155. But that is what happened.[6]

### 2. Scienter is Well-Pled, and the Inference of Scienter is Reasonable

The CAC describes in detail Defendants' scheme to induce token holders to vote in favor of the token merger so that Defendants could dump their $OCEAN tokens at the direct expense of the Alliance community. *Id.* ¶¶ 66, 78–119, 147–58. In response, Defendants contend that self-interested desire to profit does not give rise to an inference of fraudulent intent. MTD at 24. That is a sensible rule in the context of securities class actions, where "such a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor," is not sufficient for inferring scienter. *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (cited in MTD at 24–25).[7] But that rule has no application to this case. Plaintiffs allege more than "generalized profit motive." Specifically, that Defendants misrepresented the very character of the $OCEAN Community Tokens in order to enter the Alliance. Defendants never had any intention of participating in the Alliance and advancing the community's interests. Instead, their plan all along was to gain access to the liquidity the Alliance provided so that they could cash out the $OCEAN Community Tokens and abscond with tens, if not hundreds, of millions of dollars. Defendants then used their ill-gotten funds from liquidating the $OCEAN Community Tokens to revive the $OCEAN token, of which they own a substantial amount of the remaining supply. Defendants' scienter is both specifically alleged and reasonably inferred.

---

[6] Defendants' arguments about misstatements made by OceanDAO (MTD at 24) are addressed in Sections II.B, II.G.

[7] In the same breath, Defendants claim that Plaintiffs fail to plausibly allege scienter because they do not allege which Defendants sold tokens or any basis for the conclusion that such sales were for any Defendant's financial gain. MTD at 25. But Defendants cannot claim that profit motive is irrelevant for pleading scienter, and then fault the CAC for purportedly failing to plead that Defendants converted the Community Tokens for their financial gain. In any event, without the benefit of discovery, Plaintiffs are unable to discern which Defendants sold tokens, as the owner of the wallet(s) the improperly converted tokens were sent to and sold from is not publicly known. *See* CAC ¶ 95.

Next, Defendants contend that Plaintiffs impermissibly rely on "a flawed assumption about the determinate outcome."  MTD at 25.  But unlike in *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 356 (S.D.N.Y. 2011), where to "find scienter on these facts would be to assume that the duration of the financial crisis was both inevitable and foreseeable to Defendants," Plaintiffs here do not seek to hold Defendants liable for something outside of their control.  *See id.* ("[L]ack of clairvoyance simply does not constitute securities fraud.").  Rather, Plaintiffs seek to hold Defendants accountable for what they actually did: purposefully enter the Alliance through false pretenses so that they could fraudulently convert the $OCEAN Community Tokens.

Defendants then contend the CAC does not allege scienter as to the Pons and McConaghy. MTD at 25–26.  Not so.  Plaintiffs can demonstrate a strong inference of scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 29 (S.D.N.Y. 2009) (citation omitted).  And Plaintiffs have done both: alleging in detail Defendants' scheme of presenting 700 million $OCEAN Community Tokens as fully decentralized and awardable only via smart contracts; but in reality, the Pons and McConaghy dominated and controlled Ocean, OceanDAO, and Ocean Expeditions, and those entities were seen as alter egos of the Individual Defendants.  *See, e.g.*, CAC ¶¶ 15, 17, 52.[8]  Further, despite their mischaracterizations to the contrary, the Pons and McConaghy, through Ocean, OceanDAO, and Ocean Expeditions, fully

---

[8] *See* Section II.G, *infra*, for a more complete discussion of alter ego.

controlled the Community Tokens, and after fraudulently gaining entry to the Alliance, unilaterally converted them and absconded with the proceeds. *See, e.g.*, *id.* ¶¶ 51–60, 127–30, 155–57.[9]

Defendants attack the CAC's allegations that Defendants benefitted from a reduced $OCEAN supply following their wrongful conversion as "nothing more than speculation dressed as fraud." MTD at 26. But this is simple economics: when supply decreases, price increases. By ensuring that 81% of the OCEAN supply was converted to $FET tokens, with only 270 million $OCEAN tokens remaining, and thereafter reviving the $OCEAN token as if the merger never happened, Defendants ensured less $OCEAN supply, and therefore artificially inflated the price. It is more than reasonable to infer at this stage that Defendants, who are major holders of $OCEAN tokens (CAC ¶ 157), benefitted from reduced supply. *See, e.g.*, *U.S. Commodity Futures Trading Com'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012) ("[M]anipulative intent may be inferred 'where, once the congested situation becomes known … the [defendant] exacerbates the situation by … intentionally decreasing the cash supply….").

### 3.    *Plaintiffs Allege Reliance*

Defendants next contend Plaintiffs have not adequately alleged reliance. MTD at 26–27. That is wrong. The CAC alleges Plaintiffs "read and relied on the Vision Paper, blog posts, and X posts when considering the proposed merger." CAC ¶ 122. The CAC then identifies the specific blog posts and X posts that contain misrepresentations. *See, e.g.*, *id.* ¶¶ 86, 96, 100, 125–35. Further, the CAC alleges that, as a result of Defendants' "extensive efforts to solicit a favorable vote from $FET and $AGIX token holders," which included disseminating the Vision Paper, blog posts, and X posts, "token holders overwhelmingly voted in favor of the token merger." *Id.* ¶ 123.

---

[9] Rule 9 does not require Plaintiffs to ascribe a particular speaker to each statement where, as here, Plaintiffs have provided a "plausible basis" for inferring the Pons' and McConaghy's involvement in corporate communications. *See Ramiro Aviles v. S & P Global, Inc.*, 380 F. Supp. 3d 221, 290–91 (S.D.N.Y. 2019). CAC ¶ 104.

Thus, the CAC alleges specific statements—the Vision Paper, blog posts, and X posts—and how Plaintiffs relied on those statements—by voting on the merger and continuing to hold tokens. *See Ramiro Aviles*, 380 F. Supp. 3d at 291 (holding that Plaintiffs "identified specific transactions" as well as "specific reports and statements" on which they relied sufficient to plead reliance).[10] Further, the CAC specifically identifies Seth Ian as an example of a plaintiff who read the Vision Paper, online publications (e.g., blog posts and X posts), and other communications prior to voting to approve the merger, and that he relied on the accuracy of the representations set forth in those publications and communications. CAC ¶ 122. That is sufficient. *See In re Fyre Festival Litig.*, 2019 WL 5799762, at \*6 (S.D.N.Y. Nov. 7, 2019) ("At least one named plaintiff must establish that he or she can 'plausibly allege' a claim."). To the extent Defendants argue that the CAC needs to allege reliance by each individual plaintiff or proposed class member, that is both wrong and premature, as this is a (meritless) argument against class certification. *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) ("[F]raud claims based on uniform misrepresentations made to all members of the class … are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof.").

### 4.    The Complaint Alleges Injury and Causation

Finally, Defendants argue that Plaintiffs failed to plead injury or causation. MTD at 28–30. As for injury, Defendants contend that Plaintiffs impermissibly seek recovery based on what the price of $FET would have been if Defendants had not committed fraud. But Plaintiffs do not seek expected profits. Rather, Plaintiffs, as holders of devalued tokens (CAC ¶ 160), are entitled to seek to recover the loss of their investment. *See, e.g.*, *Matana v. Merkin*, 989 F. Supp. 2d 313,

---

[10] Defendants argue that any purported reliance on the Vision Paper fails because it contained a generic disclaimer. MTD at 28 n.21. But "general disclaimer language is ineffective to preclude a fraud claim as a matter of law." *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, 2015 WL 769573, at \*4 (S.D.N.Y. Feb. 24, 2015).

31

320–24 (S.D.N.Y. 2013) (discussing New York law and concluding that holders are able to recoup the out-of-pocket cost basis of an investment). Further, Defendants ignore that Plaintiffs are also injured by the loss of the Community Tokens as a core asset capable of incentivizing participation in the community. CAC ¶ 170. The Plaintiff class did not buy just a token, but bought into the Alliance and the benefits Ocean, as a member of the Alliance, promised to the community.

As for causation, Defendants argue that Plaintiffs failed to allege causation "as opposed to intervening causes such as general cryptocurrency market fluctuations." MTD at 29. But Defendants merely ignore the CAC's allegations. Defendants schemed to gain entry to the Alliance, promising that the $OCEAN Community Tokens would benefit the community. Defendants then converted the Community Tokens to $FET tokens, dumped the $FET tokens, and exited the Alliance, crippling it and the community. And "[o]nce it became apparent that Defendants dumped hundreds of millions of $OCEAN Community Tokens …, the $FET tokens experienced a dramatic decrease in value." CAC ¶ 160. Thus, the loss of value is the natural and probable consequence of Defendants' misrepresentations and scheme.[11]

C.    **Count Two—Civil Conspiracy**

Defendants argue that Count Two must be dismissed on three grounds: that civil conspiracy is not an independent tort, the underlying fraud claim fails, and the CAC does not adequately plead an agreement or overt acts. MTD at 30–31. That argument fails at each step.

As an initial matter, Plaintiffs do not assert civil conspiracy as a stand-alone cause of action untethered to any underlying wrong. Rather, Plaintiffs allege Defendants conspired to perpetrate the fraud described in the CAC. *See id.* ¶¶ 190–99. Under New York law, civil conspiracy

---

[11] Defendants claim that the fraud claim should be dismissed as duplicative. That is wrong. The breach of contract claim is based on the promises contained in the Vision Paper, while the fraud claim is premised additional statements. Further, as addressed above, the fraud claim is based on misrepresentations of fact, not mere promises to perform.

functions not as an independent tort, but as a mechanism to connect otherwise actionable tortious conduct to co-conspirators who agreed to participate in the scheme. *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009). Thus, "[t]o establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and, (4) resulting damage or injury." *Id.*

The CAC plausibly alleges facts satisfying each requirement. First, as explained in the preceding section, Plaintiffs plausibly plead Defendants committed fraud. *See supra* § II.B.

Second, the CAC plausibly pleads each element of conspiracy. Plaintiffs allege, *inter alia*, Defendants engaged in joint negotiations with Fetch and Singularity regarding formation of the Alliance (CAC ¶¶ 61–68, 75–76); jointly retained advisors and were "closely involved in drafting, editing, and finalizing" the Press Release and publishing solicitations directed at token holders to secure support for the merger (*id.* ¶¶ 83, 94); orchestrated the transfer of OceanDAO assets (*id.* ¶ 139); converted the $OCEAN Community Tokens into $FET tokens (*id.* ¶ 142), and coordinated the subsequent sale of the $FET tokens into the market (*id.* ¶ 147). *See also* Section I.C. These allegations more than suffice to plead agreement, overt acts, and knowing participation.

Finally, Plaintiffs adequately plead resulting injury, where they allege New York residents Seth Ian and Greg Graves voted in favor of the token merger and held or converted tokens in reliance on Defendants' misrepresentations (CAC ¶¶ 12–13, 122, 134–35) and that Defendants' mass conversion and liquidation of $OCEAN Community Tokens into $FET tokens depressed the value of tokens held by Plaintiffs and the putative class. *Id.* ¶¶ 141–47, 160.

Count Two is therefore properly pleaded as a theory of concerted liability for the fraud alleged in Count One. *Id.* ¶¶ 180–89, 190–99.

### D.    Count Three—GBL §§ 349 and 350

Defendants contend the CAC fails to state claims under GBL §§ 349 and 350 "because the CAC does not plead any transaction that occurred in New York, any consumer-oriented action, or any injury or causation." MTD at 31. The CAC's well-pled allegations foreclose these arguments.

"A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, (2000). In addition, "the transaction in which the consumer is deceived must occur in New York." *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 (2002).

The CAC alleges a sufficient nexus to New York. While GBL §§ 349 and 350 require the deceptive transaction occur in New York, the territoriality inquiry focuses on where the consumer is deceived "regardless of where the transaction occurs"—not physical presence alone. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122–23 (2d Cir. 2013) (acknowledging a split of authority following *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 324, 774 N.E.2d 1190 (2002) as to whether physical presence is required). Under any formulation, Plaintiffs satisfy this requirement. The allegations set out *supra* § III.A plausibly connect the deception to New York.

The CAC also alleges consumer-oriented conduct. Conduct is consumer oriented where the challenged "acts or practices have a broader impact on consumers at large" rather than constituting a private contract dispute. *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995). Indeed, "General Business Law §§ 349 and 350 'on their face apply to virtually all economic activity, and their application has been correspondingly broad.'" *Plavin v. Grp. Health Inc.*, 35 N.Y.3d 1, 9 (2020) (quoting *Karlin v. IVF Am. Inc.*, 93 N.Y.2d 282, 290 (1999)). Plaintiffs allege that type of broad, public-facing conduct:

34

a public campaign consisting of the publication and dissemination of the Vision Paper, ASI Press Release, and various social media posts designed to solicit token holders to vote for the merger and acquire and hold $ASI tokens.  CAC ¶¶ 83–91, 94–110, 120–23, 203–08.  This is precisely the type of conduct that courts recognize as consumer oriented.  *See Plavin*, 35 N.Y.3d at 10–11 (holding that insurance company's "dissemination of information to hundreds of thousands of City employees in order to solicit their selection of its plan is precisely the sort of consumer-oriented conduct that is targeted by General Business Law §§ 349 and 350") (internal quotations omitted)).

Plaintiffs further allege Defendants' conduct was misleading.  An act is "misleading" under Sections 349 and 350 where it is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Oswego Laborers' Loc. 214 Pension Fund,* 85 N.Y.2d at 26.  As set forth *supra* § II.B, Plaintiffs allege that Defendants made material misrepresentations regarding their intended use of $OCEAN Community Tokens.  CAC ¶¶ 127–47, 203–08.

Finally, Section 349 requires a plaintiff to allege the deceptive conduct caused actual injury.  *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29–30 (2000).  Here, Plaintiffs allege they voted for the merger and acquired, held, or converted tokens based on the understanding that the $OCEAN Community Tokens would remain preserved for community use, and that Defendants' subsequent appropriation and liquidation of those tokens caused financial harm.  CAC ¶¶ 134–35, 160–70, 205–08.  Plaintiffs thus state plausible claims under GBL §§ 349 and 350.

**E.     Counts Four and Five—Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing**

1.      The Vision Paper and Alliance Statements May Constitute an Enforceable Contract or Create Enforceable Obligations

Defendants argue the Vision Paper and related statements cannot give rise to a contract because they were unsigned, did not identify counterparties, and allegedly omitted essential terms.

35

MTD at 35. Defendants further contend that the implied covenant claim necessarily fails in the absence of a valid contract. *Id.* at 38. The CAC plausibly alleges both.

A contract is formed where there is "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121, (N.Y. App. Div. 1st Dep't 2009). "[A]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound." *Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 369 (2005). "Under New York law, breach of contract claims present mixed questions of law and fact." *Grewal v. Cuneo Gilbert & LaDuca LLP*, No. 13-CV-6836 (RA), 2018 WL 4682013, at *4 (S.D.N.Y. Sept. 28, 2018), *aff'd*, 803 F. App'x 457 (2d Cir. 2020).

The CAC plausibly alleges that, through the Alliance Vision Paper and related public statements, Defendants intended to induce Plaintiffs and class members to "accept" Defendants' offer to merge tokenomic networks and build a decentralized AGI community—an offer Plaintiffs accepted by approving the merger and acquiring, holding, and/or converting $ASI tokens. CAC ¶¶ 6–7 (representing in the ASI Vision Paper that $OCEAN Community Tokens would be reserved for the community in the event of a merger); *id.* ¶¶ 58–59 ("announc[ing] to Plaintiffs it had minted all remaining tokens 'for the community'"); *id.* ¶ 86 (Bruce Pon describing the "unified $ASI token" as aligning incentives across participants); *id.* ¶ 136 (Defendant Ocean Protocol Foundation promised to dedicate budget to its community incentives program if Fetch and Singularity token holders voted in favor of the merger). Defendants' own statements and partial performance reinforce the understanding that a contract was formed upon Plaintiffs' approval of the token merger. Bruce Pon and McConaghy themselves expressly referred to the "covenant" they made to Plaintiffs and other token holders to "build the tools to help every human have a chance to thrive in a future where AI, AGI and ASI is a reality." *Id.* ¶ 132. Plaintiffs allege a "central pillar of that

36

covenant" was Defendants' commitment to operate Ocean as a DAO and to preserve $OCEAN Community Tokens for community use, i.e. the Alliance. *Id.* And Defendants did, in fact, partially perform by utilizing Ocean to gain entry into the Alliance.

This case is unlike *Barron v. Helbiz Inc.*, No. 20 CIV. 04703 (LLS), 2023 WL 5672640 (S.D.N.Y. Sept. 1, 2023), on which Defendants rely. *See* MTD at 35–36. The court, relying on plaintiffs own characterizations of whitepapers as documents that "generally 'spell[] out the nature of the proposed coin, the economics of its operations, how the funds raised will be used, and its technical details," held that "the broad generalizations made in the Whitepaper regarding future performance cannot be read as contractual promises" in the absence of "more definite statements." *Id.* at *10. Here, by contrast, the CAC identifies specific, concrete representations regarding the allocation and use of $OCEAN Community Tokens, the governance structure of the Alliance, and the consequences of token holder approval. *See* CAC ¶¶ 6–7, 58–60, 86, 127–35.[12] These "more definite statements" plausibly allege contract formation at the pleading stage.

> 2.    The Covenant of Good Faith and Fair Dealing Claim Survives If Any Contractual Relationship Exists

The implied covenant claim likewise survives. "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004) (citation omitted). The covenant is breached where a party, though not violating an express contractual provision, acts in a manner that deprives the counterparty of the benefits of the agreement. *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Com.*, 265 A.D.2d 513, 514 (2nd Dep't 1999). To state a claim, a plaintiff must allege facts tending to show that the defendant acted to prevent the contract's performance or to withhold

---

[12] Nor is this a case involving a general advertisement of a cryptocurrency. Rather, the alleged agreement concerns the formation of a governance structure predicated on token holders' assent to Defendants' representations in the Vision Paper and related solicitations.

its benefits.  *Id.*  And here, Plaintiffs allege the benefit of their bargain was participation in a combined, decentralized AI ecosystem in which the $OCEAN Community Tokens would remain dedicated to community incentives and be used to develop the Alliance, not liquidated for Defendants' benefit.  CAC ¶¶ 127–35, 159–66, 216–19.  They further allege that Defendants destroyed that benefit by secretly transferring hundreds of millions of $OCEAN Community Tokens,  converting those tokens into $FET, liquidating them onto the market, exiting the Alliance, and then using the proceeds to revive the $OCEAN token at the expense of $FET holders and the Alliance community.  *Id.* ¶¶ 136–70, 218–19.  Those allegations plausibly show that Defendants acted in a manner that deprived Plaintiffs of the benefit of their agreement to approve the token merger and enter the Alliance.  *Aventine*, 265 A.D.2d at 514.  Accordingly, Counts Four and Five should not be dismissed.

## F.    Count Six—Promissory Estoppel

Defendants argue that Plaintiffs' claim for promissory estoppel should be dismissed "for the same reasons as the fraud claim."  MTD at 38.  That argument fails.  "In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of [the] reliance.'"  *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) (citation omitted).  And where, as here, Defendants dispute the existence or enforceability of a contract, promissory estoppel may be plead in the alternative.  *Pers. Watercraft Prod. SARL v. Robinson*, No. 16-CV-9771, 2017 WL 4329790, at *11 (S.D.N.Y. Sept. 1, 2017).

The CAC satisfies each element.  It alleges specific promises—central to the merger—that approximately 700 million $OCEAN tokens were locked in a decentralized autonomous organization and could not be mass liquidated.  CAC ¶¶ 56–60, 93–114, 127–28.  It further alleges that Defendants made those promises to secure token holder approval of the merger, which

38

depended on affirmative votes actively solicited through coordinated communications, including the Vision Paper and related campaign.  *Id.*¶¶ 78–91, 107–09, 120–35.    Plaintiffs—including token holders in this District—allege they read and relied on those materials in voting to approve the merger, adequately pleading when, how, and in what context reliance occurred.  *Id.* ¶ 122.  And that reliance was reasonable.    The promise addressed a core feature of the transaction, and Defendants, as founders and public representatives, possessed superior knowledge regarding that allocation of the $OCEAN Community Tokens.  *Id.* ¶¶ 52, 96–108, 127–35, 160, 165.

Plaintiffs also plausibly allege injury.  In reliance on Defendants' promises, they approved the merger and altered their positions by acquiring, holding, and converting tokens.  *Id.* ¶¶ 122–24, 134–35, 160, 222.  Defendants then allegedly did the opposite of what they promised by transferring the Community Tokens, converting them into $FET, liquidating them, exiting the Alliance, and reviving the $OCEAN token.  *Id.* ¶¶ 136–58, 218–23.  Plaintiffs allege Defendants' conduct depressed the value of the $FET token, undermined the Alliance, and inflicted concrete financial harm.  *Id.* ¶¶ 159–70, 189, 199, 214, 219, 223.

The CAC thus adequately pleads a clear promise, reasonable reliance, and resulting injury. At a minimum, Count Six should proceed as an alternative theory.

**G.    Alter Ego Allegations Are Sufficiently Pled**

As a threshold matter, Defendants' criticism of Plaintiffs' alter ego allegations fundamentally mischaracterizes how those allegations function within the CAC. Defendants devote a section of their brief to urging that the Court "disregard" the "alter ego allegations," claiming the CAC "fails to allege any facts showing that any Defendant…is an alter ego."  MTD at 38.  Defendants allege that Plaintiffs only offer "speculative" remarks that OceanDAO is an

39

alter ego of Messrs. Pon and McConaghy, and that the CAC fails to plead the "'exceptional circumstances' required to pierce OE's corporate veil." *Id.* at 39–40.

But this argument misses the point. Plaintiffs have alleged that OceanDAO and Ocean Expeditions were not just dominated and controlled by the Individual Defendants, but they were used as instrumentalities so that Defendants could carry out their scheme. OceanDAO does not appear to have been an independent corporate entity. *See* CAC ¶ 17. Ocean Expeditions was purposely created in the Cayman Islands solely to serve as the offshore conduit for receiving, converting, and liquidating the $OCEAN Community Tokens when Defendants decided to carry out that step in their scheme. *Id.* ¶¶ 18–19, 139–47. Both entities were instrumentalities used by the Pons and McConaghy to carry out their scheme, and the Individual Defendants cannot evade liability by pointing to OceanDAO and Ocean Expeditions as the responsible entities.

Moreover, while OceanDAO was purportedly a DAO that held the $OCEAN Community Tokens, "the transfer of all of OceanDAO's assets to Ocean Expeditions by Defendants (and without any community involvement whatsoever) demonstrates that OceanDAO was never actually a decentralized, autonomous organization." *Id.* ¶ 140. To the extent that discovery confirms that OceanDAO was never a legal entity with a separate corporate identity, then the actions taken by OceanDAO are in fact direct actions undertaken by Pon and McConaghy.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. In the alternative, should the Court find the jurisdictional record insufficient, Plaintiffs respectfully request leave to conduct jurisdictional discovery before any ruling on the 12(b)(2) motion.

40

Dated: June 5, 2026

**K&L GATES LLP**

/s/Thomas A. Warns
Thomas A. Warns
Edward T. Dartley
Alexander D. Walsdorf
599 Lexington Avenue
New York, NY 10022
Phone: (212) 536-3900
Ed.Dartley@klgates.com
Tom.Warns@klgates.com
Alex.Walsdorf@klgates.com

Steven L. Caponi (*admitted Pro Hac Vice*)
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
Steven.Caponi@klgates.com

Kendall Huennekens
134 Meeting Street, Suite 500
Charleston, SC 29401
Phone: (843) 579-5601
Kendall.Huennekens@klgates.com

*Counsel for Plaintiffs*

41